**In the Matter of the Application of Peter F. THEIS.**

**Appeal No. 79–574.**

United States Court of Customs and Patent Appeals.

Dec. 6, 1979.

---

* The Honorable John G. Penn, United States District Court for the District of Columbia, sitting by designation.

Jerold A. Jacover, Chicago, Ill., attorney of record, for appellant, John L. Cline, Chicago, Ill., of counsel.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents, Thomas E. Lynch, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN and MILLER, Judges, and NEWMAN,* Judge.

RICH, Judge.

This appeal is from the decision of the Patent and Trademark Office (PTO) Board of Appeals (board) affirming the rejection of claims 11–23, all claims in application serial No. 604,930, filed August 15, 1975, entitled "Programmed Conversation Recording System."[1] The claims were rejected under 35 U.S.C. § 102(b) as drawn to subject matter which had been on sale for more than one year prior to the filing date of the parent application. We affirm.

### The Invention

Appellant's invention is a system capable of simulating a conversation with a respondent. The system is programmed with a series of prerecorded statements or questions which are played to the respondent. After hearing each statement, the respondent has an indefinite time in which to give a response which is recorded by the system. The system then responds to the voice or vocal pauses made by the respondent by playing the next statement or question to the respondent and recording the corresponding response until the needed information has been obtained.

Claim 11 is illustrative:

11. Apparatus for simulating a conversation with a respondent including a plurality of pre-recorded messages which are playable in sequence in response to a corresponding response from the respondent comprising:

---

* The Honorable Bernard Newman, Judge, United States Customs Court, sitting by designation.

1. This application is a continuation-in-part of application serial No. 439,445, filed February 4, 1974, now abandoned.

means for detecting a pause in the respondent's communication;

means responsive to said pause for playing the next prerecorded message;

means for detecting a lack of response from the respondent to a prerecorded message; and

means responsive to said lack of a response for altering said sequence.

Although one of the principal uses contemplated by appellant for his system is in conjunction with a telephone system wherein the respondent is a telephone caller, the claims are not limited to include telephone apparatus. Appellant's specification states that "the system has a number of applications that do not utilize the telephone system," and cites several examples of non-telephone related applications.

### Background

In order to overcome a 35 U.S.C. § 102(a) rejection based upon a patent issued to Winterhalter, cited by appellant in a prior art statement to the PTO, appellant submitted an affidavit under Rule 131 to swear back of that reference.[2] Included in the affidavit, dated June 22, 1976, were exhibits I, J, and K, all invoices evidencing delivery to customers of systems embodying the claimed invention. The affidavit stated that the systems were delivered prior to June 4, 1973, the filing date of the reference.

In response, the examiner entered a rejection under § 102(b), stating:

Applicant's exhibits I through J [sic K] suggest that the device was "on sale" more [than] one year prior to the filing date of the original application. In order to overcome this rejection applicant should research the criteria for "experimental use" and then set forth facts which show applicant meets the criteria.

The critical date, one year prior to the date on which appellant's parent application was filed, is February 4, 1973.

In an attempt to overcome the § 102(b) rejection, appellant submitted three additional affidavits of his own, two affidavits by Buchberger, his engineering assistant, and one affidavit by Mitchel, vice president of Market Facts, Inc. (Market Facts), a recipient of two of the systems.

Appellant's additional affidavits stated that six systems had been offered to customers including Montgomery Ward, J. C. Penney, Market Facts, and Household Finance Corporation, prior to the critical date.[3] In addition, appellant's affidavits, and those of Buchberger, detailed the nature of the problems encountered with the systems, concluded that the systems were incapable of functioning in their intended manner until after the critical date, and set forth the various procedures undertaken to cure the defects.

The Mitchel affidavit corroborated that the systems were delivered to Market Facts and installed prior to the critical date. The affidavit further stated that the systems did not function, that appellant expended considerable effort in attempts to get them to work, and that the systems never did function as intended and were disconnected. Accompanying the affidavit were exhibits A, B, and C, copies of correspondence between applicant and Market Facts concerning the acquisition by Market Facts of the systems in question.

The examiner was of the opinion that Exhibits A thru C, submitted with the Mitchel affidavit, evidenced a contract of sale between appellant and Market Facts. In exhibit A, Mitchel states: "The units when installed will not be considered purchased until both are working to the complete satisfaction of Market Facts." In exhibit B, Mitchel states, in toto, "*This letter serves as purchase authorization* for two Con-Mode [system trademark] units. *This purchase is* made under the conditions of our letter to you dated December 6, 1972, and your letter to Market Facts dated December 20, 1972." (Emphasis ours.)

---

2. The examiner's § 102(a) rejection was reversed by the board.

3. Affidavit of Theis dated December 23, 1976.

Appellant contended that the deliveries made prior to the critical date were for experimental purposes and thus fell under the exception to the statutory loss of right to patent provision, § 102(b), which exception has existed at least since *Elizabeth v. Pavement Co.*, 97 U.S. 126, 24 L.Ed. 1000 (1877). For this argument, he relies on the fact that the systems did not work as delivered, the fact that several of the invoices for systems delivered prior to the critical date contained the legend "6 month evaluation," [4] and the fact that the systems, after installation, were constantly modified and repaired by appellant and Buchberger in an attempt to get them to function properly.

Before the board, appellant argued that although the equipment was delivered to various recipients, title to the equipment remained with appellant, and so no "sales" were consummated. He further denied that the systems were on sale because they were used by the recipients for evaluation purposes.

Appellant continued to press his argument that the use of the systems prior to the critical date was experimental in nature. In addition, appellant argued that since the systems were inoperative for their intended purposes, they did not embody the claimed invention. Thus, according to appellant, that which was in use prior to the critical date was not the claimed invention, making the loss of right provision of § 102(b) inapplicable.

### The Board

The board found that the systems bearing serial Nos. 001–004 were delivered prior to the critical date.[5] The board noted that, of the systems delivered prior to the critical

date, only serial No. 001 was, according to the invoice, delivered for a "6 month evaluation." Although Mitchel averred in his affidavit that the systems delivered to Market Facts were for a six-month evaluation period, the board found that this was contradicted by exhibits A, B, and C accompanying the affidavit. The board observed that these letters (portions of which we have quoted supra) were silent regarding any evaluation, experimentation, or control of the systems by appellant.

Appellant had urged that the statement in exhibit A (Mitchel's letter of December 6, 1972), viz: "The units when installed will not be considered purchased until both are working to the complete satisfaction of Market Facts," corroborated the statement in the Mitchel affidavit that the systems were delivered for a six-month evaluation period. However, the board viewed this statement as "no more than a demand for a money back guarantee; a warranty, a right of recission or a right to a refund." The board viewed the exhibits as evidence of a contract of sale:

> The correspondence manifestly constitutes an offer to buy under certain conditions, a counter offer to sell on modified conditions and a purchase authorization. In our opinion, this correspondence between appellant and Mitchel is clear evidence that the equipment was "on sale" prior to the critical date. Whether or not a sale was, in fact, consummated is not controlling, although, as we view the evidence, a sale to Market Facts was made prior to the critical date.

The board held that other evidence of record tended to bolster its conclusion that the system was on sale prior to the critical

---

4. The record shows that the invoices for the two systems sent to Montgomery Ward and one sent to Household Finance Corporation bore this legend. The invoice for the two systems sent to Market Facts does not bear the legend, and the invoice for the system sent to J. C. Penney does not appear in the record.

5. According to appellant Theis's affidavit dated December 23, 1976, these systems were delivered as follows:

001 Montgomery Ward (Cleveland)

002 J. C. Penney (Milwaukee)
003 Market Facts (Chicago)
004 Market Facts (Chicago)

The system bearing serial No. 005 was delivered to Household Finance Corporation on February 9, 1973; however, the invoice indicates that the order was taken on October 12, 1972. According to the Theis affidavit dated February 3, 1978, system serial No. 006 was delivered to Montgomery Ward in Houston sometime in February, 1973.

date. A letter from appellant responding to questions from Lee Weber, Marketing Manager of Sears Roebuck, dated December 21, 1971, about appellant's "ability to produce adequately for Sears' requirements," purported to "clarify our production abilities" and proposed "a special production line for your requirements." Status reports regarding appellant's attempts to sell to Sears and Wards, both dated February 2, 1972, detailed appellant's plans to have those two giant retailers test the systems against competing systems with the ultimate objective of making a sale. A letter to Charles Brown of Associated Merchandising, dated June 14, 1972, described the system and advised that within a week appellant would be in touch to give Brown a phone number to call for a demonstration of the system. A letter from appellant to John H. Rosenhein of Universal Training Systems Company, dated July 10, 1972, offered to show Rosenhein what Wards and Sears were doing with the system, referring to them as "customers."

Finally, the board relied on a press release, dated January 7, 1973, announcing the system at the National Retail Merchant's Association Annual Retailer's Business and Equipment Exposition, as "strong evidence of an 'on sale' status." At this retailer's trade show, appellant had placed a demonstration model on display. The press release concluded:

> The CON–MODE [trademark used to identify appellant's system] has been developed by Morgan Industries, Inc. and patents are being applied for according to the Company. Conversational Voice Terminal Corporation will act as the national sales and service organization for this important product. *First deliveries are being made this month. If you want to try a CON–MODE call our demonstration system at 312–463–2870!* [Emphasis ours.]

The board rejected appellant's contention that the activity prior to the critical date was, in the eyes of the law, for test and evaluation purposes. It noted that the Sears and Wards status reports indicated that the field tests in which appellant wanted the system included were for the benefit of the retailers, not appellant, and would not have been under appellant's control. As for the "6 month evaluation" notation on invoices for system serial Nos. 001, 002, 005, and 006, the board found the notation ambiguous, since there was "no indication as to evaluation by whom, for what purpose or for whose benefit [the evaluations were to be conducted] and there is certainly no indication that the equipments were subject to appellant's supervision and control." The board concluded that any evaluation was for the purposes of the recipients of the systems, not appellant.

Regarding the averments in the affidavits of Theis and Buchberger that the systems had been modified and tested virtually every day, the board stated that there was no evidence that this was done for the benefit of appellant. It also pointed out that, according to the affidavits, not all of the systems were subjected to such rigorous procedures.

The board further observed that nowhere in the invoices or correspondence had appellant indicated that any limitations or restrictions or injunctions of secrecy had been imposed upon the users of the systems during the six-month evaluation period, citing *In re Blaisdell,* 44 CCPA 846, 242 F.2d 779, 113 USPQ 289 (1957). Also, the board found no evidence that the recipients of the systems undertook to supply test or operational data to appellant.

Finally, the board rejected appellant's argument that the systems delivered prior to the critical date did not function for their intended purpose and thus could not have embodied the claimed invention, since the claims required that the system function properly in "conversing" with a respondent. Appellant had relied for this proposition on Kayton, *Patent Law Perspectives* § A.3[5] at A449–A451 (1967–68 Annual Review). The board found that many of the problems encountered by appellant with the systems were caused by the interface with telephone equipment when the system was used in conjunction with a telephone system.

While the board acknowledged that the problems were real in the environments in which the systems were used, it felt that the problems were not germane to the claimed subject matter. The claims are silent with respect to the environment in which the system is to operate, not being limited to use of the system in conjunction with a telephone, although the specification states that the system is chiefly used with telephone equipment. The board held that experimentation to perfect such nonclaimed features does not fall within the experimental exception to the loss of right under § 102(b) on the authority of *Minnesota Mining and Manufacturing Co. v. Kent Industries, Inc.,* 409 F.2d 99, 161 USPQ 321 (6th Cir. 1969).

### Appellant's Arguments

Before this court, appellant continues to urge that the loss of right provision of § 102(b) cannot apply since the devices delivered prior to the critical date were "inoperative" until long after the critical date. He cites *Illinois Tool Works, Inc. v. Solo Cup Co.,* 179 USPQ 322 (N.D.Ill.1973), and other cases for the proposition "that a device which is inoperative for its normal and intended purpose has 'absolutely no prior art status' even if it is 'on sale or in public use' more than one year prior to the effective filing date of a patent application."

Also, appellant continues to argue that the devices delivered prior to the critical date were the subject of bona fide experimentation and thus exempt from § 102(b). He relies on the notation "6 month evaluation" on several of the invoices, and further on the fact that the systems did undergo major modifications while in use at their respective locations before they were usable for their intended purpose.

Finally, appellant argues that public policy considerations demand that he be allowed to properly perfect his invention before being required to apply for a patent. He states that the actions of the PTO in this case work an unnecessary hardship on inventors by forcing them to file their applications before they can make a reasonable determination that their inventions are worth the time and expense of seeking patent protection.

### OPINION

An inventor loses his right to a patent if he has placed his invention "on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). Even a single, unrestricted sale brings into operation this bar to patentability. *Consolidated Fruit-Jar Co. v. Wright,* 94 U.S. 92, 94, 24 L.Ed. 68 (1876); *In re Blaisdell,* 44 CCPA 846, 851, 242 F.2d 779, 783, 113 USPQ 289, 292 (1957).

Appellant makes three main contentions. He disputes the finding that the systems were "on sale" prior to the critical date, although he admits that as many as six systems may have been delivered prior to that date. He asserts that § 102(b) cannot apply because his devices were inoperative and thus did not embody the claimed invention, and that any activity prior to the critical date was bona fide experimentation, exempting him from the effect of § 102(b) on the authority of cases such as *Elizabeth v. Pavement Co.,* supra. We shall deal with these contentions in order.

#### a. The "On Sale" Issue

We think the board had ample evidence by which it could properly conclude that at least one sale took place prior to the critical date. In the absence of an exception to the statutory bar, this would suffice to bar appellant from a patent. *Consolidated Fruit-Jar v. Wright,* supra. Although it is not clear from the record that delivery of the systems to Market Facts actually took place prior to the critical date, delivery is not the crucial event.

For § 102(b) to apply, it is not necessary that a sale be consummated. It suffices that the claimed invention, reduced to practice, was placed on sale, i. e., offered to potential customers, prior to the critical date. *Akron Brass Co. v. Elkhart Brass Manufacturing Co.,* 353 F.2d 704, 709, 147 USPQ 301, 305 (7th Cir. 1965). Even if no

delivery is made prior to the critical date, the existence of a sales contract prior to that date has been held to constitute an "on sale" status for the invention if it has been reduced "to a reality." *Hobbs v. United States, Atomic Energy Commission*, 451 F.2d 849, 859, 171 USPQ 713, 720 (5th Cir. 1971) and cases cited. As the court there said, "an invention passes out of the experimental stage and becomes a reality for purpose of the statutory bar even though it may later be refined or improved." The fact that delivery may have occurred after the critical date is of no moment.

The record shows that, as early as December 6, 1972, almost two months prior to the critical date, appellant was negotiating with Market Facts in an attempt to sell his systems. We agree with the board that the correspondence between appellant and Mitchel (exhibits A–C accompanying the Mitchel affidavit) appears to constitute a contract of sale for a presently available system.

The Market Facts invoice does not indicate that the delivery was for an evaluation period. Neither the board nor this court consider that the Mitchel exhibits provide any support for the contention that Market Facts was to evaluate the system for appellant's benefit. Thus the board was correct in refusing to give weight to the statement in the Mitchel affidavit that the transaction was for experimental purposes. *See Robbins Co. v. Lawrence Manufacturing Co.*, 482 F.2d 426, 433–34, 178 USPQ 577, 582–83 (9th Cir. 1973).

■ There was other independent evidence before the board which justifies the conclusion that the system was "on sale" prior to the critical date. Appellant's correspondence with Sears, and the status reports concerning Sears and Wards, as well as the press release for the National Retail Merchant's Association trade show were considered by the board to be "strong evidence" on this point.[6] "On sale" status may be found from activity by the inventor or his company in attempting to market the invention. *Amphenol Corp. v. General Time Corp.*, 397 F.2d 431, 433, 158 USPQ 113, 114 (7th Cir. 1968). This is because the inventor's loss of right to a patent flows from the attempt to profit from the invention by commercial exploitation beyond the grace period allowed by Congress. *Elizabeth v. Pavement Co.*, supra, 97 U.S. at 137, 24 L.Ed. 1000; *Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co.*, 153 F.2d 516, 520, 68 USPQ 54, 58 (2d Cir.), *cert. denied*, 328 U.S. 840, 66 S.Ct. 1016, 90 L.Ed. 1615 (1946).

### b. The Experimental Exception Issue

■ Appellant argues that loss of right under § 102(b) should not apply here because the system was the subject of bona fide experimentation prior to the critical date. Since we have agreed with the board that appellant's system was "on sale" prior to the critical date, appellant must show that he comes under the *Elizabeth v. Pavement Co.* experimental use or sale exception by proof which is "full, unequivocal, and convincing." *Smith & Griggs Manufacturing Co. v. Sprague*, 123 U.S. 249, 264, 8 S.Ct. 122, 31 L.Ed. 141 (1887); *In re Dybel*, 524 F.2d 1393, 1400, 187 USPQ 593, 598 (CCPA 1975); *In re Blaisdell*, 44 CCPA at 851–52, 242 F.2d at 784, 113 USPQ at 293.

Appellant's argument must fail. We agree with the analysis made by the board. The notation "6 month evaluation" on several of the invoices is equivocal. It is not clear on the face of the invoices who is to benefit from the evaluation. It is as likely that the evaluation was for the benefit of the customer, who would want to know if the system suited his purposes, as for the benefit of appellant. Such "market testing" does not fall within the experimental use exception, *Cataphote Corp. v. DeSoto Chemical Coatings, Inc.*, 235 F.Supp. 936,

---

6. We find the activities of appellant at the trade show to be particularly probative. Appellant was unquestionably seeking to penetrate the market at the time of the show. The statement in appellant's press release, "First deliveries are being made this month," is a fairly strong indication that the system was "on sale" at that time, and is inconsistent with the assertion that the system was still in the development stage.

939, 143 USPQ 229, 231–32 (N.D.Cal.1964), *aff'd.*, 356 F.2d 24 (9th Cir.), *modified on other grounds*, 358 F.2d 732 (9th Cir.), *cert. denied*, 385 U.S. 832, 87 S.Ct. 71, 17 L.Ed.2d 67 (1966), because it is "a trader's, and not an inventor's experiment." *Smith & Davis Manufacturing Co. v. Mellon*, 58 F. 705, 707 (8th Cir. 1893). In addition, the notation does not appear on all of the invoices. As we have already discussed, with respect to the systems delivered to Market Facts, there were no restrictions or qualifications for the benefit of appellant. The full price was charged. Like the board, we view that transaction as an outright sale.

■ It is settled law that the experimental sale exception does not apply to experiments performed with respect to non-claimed features of an invention. *Minnesota Mining & Manufacturing Co. v. Kent Industries, Inc.*, supra. It appears from the record that most of the "experimenting" done on the systems was done for the purpose of correcting problems with the telephone interface. The claims do not require that the system be used with a telephone system. Thus, any work done to improve the operation of the system as it is used with telephone equipment does not aid appellant's experimental use argument.[7]

Although appellant has alleged that other problems, not related to the telephone system, were encountered with his system, we do not believe that his efforts to correct those problems, in the context of all of the facts developed in the record, warrant a reversal of the board's decision. We agree with the board that the problems associated with the pause timing, spurious noise from radio interference and other nearby equip-

ment, drifting filters, and arcing relay contacts were solvable by routine debugging, setup, and installation adjustments.[8]

■ The context in which all of appellant's activities in the period immediately preceding the critical date exist is clearly that of an attempt at market penetration. Even if there is a bona fide experimental purpose, an inventor may not commercially exploit his invention for more than one year prior to the filing of his patent application. *In re Dybel*, supra, 524 F.2d at 1400, 187 USPQ at 598, and cases cited. The experimental exception applies only if the commercial exploitation is merely incidental to the primary purpose of experimentation to perfect the invention. *Smith & Griggs Mfg. Co. v. Sprague*, supra, 123 U.S. at 256, 8 S.Ct. 122; *Cali v. Eastern Airlines, Inc.*, 442 F.2d 65, 70, 169 USPQ 753, 757 (2d Cir. 1971). On the strength of the evidence of record, the board was correct in holding that the primary motivation behind appellant's activities was commercial, and that the experimental use or sale exception should not apply in this case.[9]

### c. The Inoperativeness Issue

■ Appellant also relies on the theory that the bar of § 102(b) should not apply because, at the time prior to the critical date when Market Facts and others were using the systems, the systems were "inoperative." It appears that appellant argues the views appearing in the treatise, *Patent Law Perspectives* (PLP). The theory is that during the period when the invention is not yet operative it does not exist since it

---

**7.** In his affidavit of February 3, 1978, appellant detailed the major problems encountered with the system. The numerous problems are labelled a–o in the affidavit. Problems b–h, and o are related to the telephone interface, and are thus irrelevant to the issue before us.

**8.** It appears that all of these problems were solved without the need to change any of the major functional blocks of the system. Flattening filter response, supplying arc suppression and radio frequency interference suppression capacitors, and adjusting pause intervals are minor "tune up" procedures not requiring

an inventor's skills, but rather the skills of a competent technician, such as appellant's assistant Buchberger.

**9.** Like the PTO, we find it difficult to believe that major retailers, such as Sears and Wards, would permit appellant to experiment with his system on their telephone lines at the expense of their high volume mail-order business. Appellant's status reports, previously referred to, indicate that what Sears and Wards had in mind was comparative testing between appellant's system and competing systems to determine which was more suitable for their needs.

has not yet been reduced to practice, and therefore cannot be used, sold, or placed on sale.[10]

We find this argument wanting because appellant has failed to show that the *claimed invention* was inoperative. As pointed out by the board, the chief cause of the alleged inoperativeness of appellant's systems in the hands of users was telephone line interface problems. In view of the fact that the claims do not require the use of telephones, these problems could not have prevented a reduction to practice under the PLP analysis because the invention claimed is independent of telephones and can be reduced to practice without them.

Furthermore, with respect to the other problems referred to in the affidavits, we view them as minor and not precluding actual reduction to practice in the eyes of one of ordinary skill in the art.[11] In any event, there is no evidence that the demonstration model was in any way defective. We find it difficult to imagine that appellant would demonstrate an inoperative system at a trade show and elsewhere in an attempt to drum up business.

One further argument pressed by appellant with regard to this issue deserves comment. In his brief here, appellant states that it is the law "that a device which is inoperative for its normal and intended purpose has 'absolutely no prior art status' even if it is 'on sale or in public use' more than one year prior to the effective filing date of a patent application." For this proposition, he cites, inter alia, *Illinois Tool Works, Inc. v. Solo Cup Co.,* supra.

Appellant's reliance on this case is misplaced. *Prior art* is not involved in this case. Here appellant has *lost his right to a patent* by attempting to commercially exploit his invention for a period longer than Congress allows. This is not the same as refusing to treat a defective reference as prior art, which is what was involved in the *Illinois Tool Works* case. In the former situation, an inventor, by delay, *forfeits* a right he would otherwise enjoy; in the latter situation a defective reference is disregarded because it does not work.

Appellant argues that public policy demands that he be given time to adequately develop his invention before being forced to file a patent application. All we have to say is that the law gives him a year. He cannot expand it.

The decision of the board is *affirmed.*

*AFFIRMED.*

---

10. Patent Law Perspectives (1967–68 Annual Review) § A.3[5] states at A450:

Viewed properly, the public use is either before the actual reduction to practice of the invention and therefore before the existence of the invention, or it is after the actual reduction to practice and therefore after the invention has been made. If it is after the reduction to practice (and therefore after the completion of the invention), then *any* public use more than one year before the filing date necessarily constitutes a statutory time bar. On the other hand, if the public use occurs prior to the date of the actual reduction to practice (and therefore prior to the completion of the invention in the United States), the question of whether it is experimental is largely meaningless since there can be no use of any invention which is not in existence (that is, the alleged "public use" is for the very purpose of carrying out the actual reduction to practice so that the making of the invention is incomplete).

11. There is no requirement that an invention function perfectly in order to be reduced to practice or considered as on sale or in public use. All that is necessary is that the invention be commercially operable; it may have problems which are not due to "fundamental defects." *National Biscuit Co. v. Crown Baking Co.,* 105 F.2d 422, 424, 42 USPQ 214, 215 (1st Cir. 1939).