BARMAG BARMER MASCHINENFA-
BRIK AG, Plaintiff,

v.

MURATA MACHINERY, LTD, and Mu-
rata of America, Inc., Defendants.

No. C–C–81–151–M.

United States District Court,
W.D. North Carolina,
Charlotte Division.

March 17, 1983.

Charles B. Park, III and Joell T. Turner, Bell, Seltzer, Park & Gibson, Charlotte, N.C., for plaintiff.

B. Irvin Boyle, Charlotte, N.C., and Wayne Willenberg, Spensley, Horn, Jubas & Lubitz, Los Angeles, Cal., for defendants.

## MEMORANDUM OF DECISION AND ORDER

McMILLAN, District Judge.

On April 10, 1981, plaintiff Barmag filed this suit, alleging that defendants Murata and Murata of America infringed and induced others to infringe plaintiff's letters Patent No. Re. 30,159 by marketing, sales, demonstration, and servicing activities in this district with respect to a false twist textile crimping machine covered by the patent.

On November 12, 1983, defendants moved for summary judgment on the ground that the patent was invalid under 35 U.S.C. § 102(b) because the patented assembly was "on sale" in this country more than one year prior to the filing of the patent application in the United States. Lengthy memoranda with accompanying exhibits have been submitted by both sides.

On January 19, 1983, a hearing was conducted on defendants' motion for summary judgment. Plaintiff was given an additional two weeks to file a supplemental memorandum calling attention to any evidence in the record that would support its position that the patented assembly was not "on sale" more than one year before the patent application was filed. A supplemental brief was received from the plaintiff on February 7, 1983, and one was received from defendants on February 11, 1983.

After careful consideration of the briefs, exhibits, and arguments of counsel, the court finds that there is no genuine issue of material fact and that summary judgment for defendants is appropriate.

*Background*

Plaintiff Barmag is a West German corporation which manufactures synthetic yarn manufacturing and texturing equipment; it has an established subsidiary, American Barmag, in Charlotte, North Carolina. Defendant Murata is a Japanese corporation which also manufactures synthetic yarn manufacturing equipment. Defendant Murata of America is a North Carolina corporation, with offices in Charlotte, which sells and services equipment produced by Murata.

Synthetic yarn is produced from liquid in a continuous filament by an extrusion process—a mechanical counterpart to the production of natural fibers by a silkworm or a spider. Unlike cotton or silk and other natural fibers, however, monofilament yarn is smooth and straight; it has no "body" or "texture." It is commercially desirable, therefore, to give texture or body to synthetic yarn. This is done by (1) passing it over a heating element, stretching (*i.e.*, "drawing") and twisting it while it is being so heated; then (2) cooling and untwisting the yarn as it passes over a cooling plate, and (3) then partially re-heating and relaxing the yarn. This leaves the yarn with a twist or "body" or "texture" of its own.

The machines which do this drawing and texturing are called draw texturing machines, or false twist crimping machines.

Under the "state of the art" for such machines in the early 1970's, it was believed by many that the filament yarn had to travel vertically, in a straight line *downward,* during the heating and the cooling processes. It was believed that a bend in the yarn path would disrupt the draw and twist.

As machine speeds increased (the rate of travel for yarn in process reached 600 meters a minute or about 24 miles an hour), the length of necessary exposure of the yarn to heating and cooling elements also increased. Machines grew taller; some were two full stories tall.

Manufacturers complained; two-story machine rooms are expensive; plants became obsolete; some had to be closed; new ones had to be built.

Plaintiff Barmag was already manufacturing, and had patented, its own variety of "too tall" textile false twist crimping machines. However, plaintiff Barmag, through the efforts of Hermann Kubler, manager of research and development, designed and made a "lowboy" machine which repudiated the "state of the art" which had called for continuous vertical downward travel of the yarn. In plaintiff's design the yarn from the bobbins travels *up*ward at about a 45 degree angle (about the angle of a flight of stairs) to a height of eight or ten feet, during which upward travel it is heated, stretched ("drawn") and twisted; it is then turned sharply and travels straight *down*ward for several feet during which it is cooled to "fix" its newly acquired texture; and, eventually, after further re-heating, it reaches the spools or bobbins which receive it in its newly acquired textured condition.

This process worked.

It made possible the installation of high speed texturizing machines in plants with low ceilings.

On July 5, 1975, plaintiff filed for a patent in Germany on the angled arrangement.

On June 30, 1976, plaintiff filed an application, Number 4,058,961, for a United States patent on the invention. (The patent in suit, No. RE 30,159, filed November 30, 1978, is a re-issue of Patent No. 4,058,-961.)

However, more than a year before applying for the United States patent on June 30, 1976, plaintiff peddled the new arrangement in the United States.

The question is whether or not the plaintiff's United States patent is invalid under 35 U.S.C. § 102(b) because the patented assembly was "on sale" in this country more than a year before plaintiff filed application in this country for a patent on the arrangement.

*Development and Marketing of the Patented Assembly.*

Barmag's first efforts to develop and market Kubler's idea involved Burlington Industries of North Carolina. In January, 1974, Burlington expressed an interest in purchasing up to 45 texturing machines from Barmag if the machines could be made to fit within Burlington's existing factories, which had ceiling heights of about ten feet. At a meeting in Germany on December 3, 1974, Barmag presented Burlington with a proposal for a slanted heater machine which conformed to Burlington's height requirements. A technical diagram of the machine was forwarded to Burlington in High Point, North Carolina, on December 13, 1974. This slanted heater machine was also known as the "low profile" machine, and later was called the "FK6–SS" or "FK6–L" machine.

At the December 3, 1974, meeting, Barmag agreed to construct a slanted heater machine for Burlington to evaluate in March or April of 1975. It was further agreed that if Burlington placed an order for the machines by early May, 1975, Barmag would deliver two full production machines in December 1975, followed by five such machines every month thereafter.

On December 18, 1974, a follow-up meeting was held at Burlington's facilities in Greensboro, North Carolina, to discuss the price of the machines. Present at that meeting were Harry de Hass, vice-president of sales for American Barmag; Edwin Rob-

bins, vice-president of research and development of the Klopman textured woven division of Burlington; Theodore Lide, vice-president of manufacturing at Burlington; and Ralph Harwood of the purchasing department at Burlington.

Barmag completed construction of the machine in March 1975. Photographs of the machine were sent to Burlington in Greensboro in March, 1975.

A detailed quotation for the slanted heater machines was sent to Ralph Harwood, a purchasing agent at Burlington, on April 8, 1975. This quotation (Defendants' Exhibit 11) contains an eleven-page description of the machine, quantity (25 machines), price ($346,900 per machine), delivery and payment terms, and warranties and limitations. The quotation was sent under a cover letter signed by Harry de Haas, vice-president of sales at American Barmag.

On April 9, 1975, at a meeting at American Barmag in Charlotte, Burlington reconfirmed its intent to purchase Barmag's slanted heater machine. Another meeting was held in Greensboro on May 22, 1975, for further negotiations of the payment, delivery, warranty, and other terms of Burlington's purchase of Barmag's slanted heater equipment. (Harry de Haas, vice president of sales at American Barmag, testified that "this was not a technical meeting; this was a sales meeting that had to do with the price structure, the discounts, the time of deliveries, the warranties ... ironing out little details" (Dep. pp. 38–39).)

Burlington personnel tested and evaluated Barmag's machine in Germany from June 2 through June 16, 1975. On June 13, 1975, another detailed quotation (Defendants' Exhibit 12) was sent to Theodore Lide, as director of purchasing at Burlington, from Harry de Hass, vice-president of sales at American Barmag. This quotation included various agreements on payment, time tables for delivery, 13 pages of specifications on the machine, estimated spare part usage, and life expectancy of the various parts. Lide considered the quotation to be a sales offer which would be binding on acceptance by Burlington (Dep. pp. 52–53).

On June 30, 1975, American Barmag placed an order with Barmag for two of the full production low-profile machines to be delivered to Burlington (Defendants' Exhibit 13), which was confirmed by a written purchase order from Burlington dated July 18, 1975 (Defendants' Exhibit 14). Construction of the first low-profile machine was completed in January, 1976; that machine was tested in Germany before two machines were delivered to Burlington in March, 1976.

*The Applicable Law.*

Defendants' motion for summary judgment is based on the contention that the plaintiff's patent is invalid under 35 U.S.C. § 102(b):

A person shall be entitled to a patent unless—

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for the patent in the United States.

The single issue here is whether the patented assembly Re 30,159 was "on sale" in the United States before June 30, 1975.

A single offer for sale is sufficient to invalidate a patent under 35 U.S.C. § 102(b). *General Electric Co. v. United States,* 654 F.2d 55, 60 (Ct.Cl.1981); *Robbins Co. v. Lawrence Manufacturing Co.,* 482 F.2d 426, 433 (9th Cir.1973). In *Timely Products Corp. v. Arron,* 523 F.2d 288 (2d Cir.1975), the Second Circuit carefully analyzed the legislative history and legal precedents of 35 U.S.C. § 102(b) and delineated three tests for determining whether an offer for sale falls within the "on sale" bar of § 102(b):

(1) The complete invention claimed must have been embodied in or obvious in view of the thing offered for sale [citations omitted]. Complete readability of the claim on the thing offered is not required because whatever is published (or on sale) more than one year prior to the filing of the patent application becomes part of the prior art over which the claim must be patentable [citations omitted].

(2) The invention must have been tested sufficiently to verify that it is operable and commercially marketable. This is simply another way of expressing the principle that an invention can not be offered for sale until it is completed, which requires not merely its conception but its reduction to practice [citations omitted].

(3) Finally, the sale must be primarily for profit rather than experimental purposes [citations omitted].

523 F.2d at 302. This understanding of § 102(b) has been followed by courts recently addressing the issue. *In re Corcoran,* 640 F.2d 1331, 1333–34 (Cust. & Pat. App.1981); *In re Theis,* 610 F.2d 786 (Cust. & Pat.App.1979); *Digital Equipment Corp. v. Diamond,* 653 F.2d 701, 718 (1st Cir.1981); *Delong Corp. v. Raymond International, Inc.,* 622 F.2d 1135 (3rd Cir.1980).

### A.

#### The machines were offered for sale to Burlington before June 30, 1975.

Harry de Haas, director of sales at American Barmag, sent the April 8, 1975, quotation to Ralph Harwood, a purchasing agent at Burlington and the June 13, 1975 quotation to Theodore Lide, as director of purchasing at Burlington. Both quotations include complete specifications of the machine, all price and delivery terms, warranties and limitations—in short, an offer complete with the necessary terms for an agreement to purchase two full production low-profile machines. Theodore Lide testified that he understood the June 13, 1975 quotation to be an offer, which, if accepted by Burlington, would form a contract (Dep. pp. 52–53).

Plaintiff argues that the quotations are not offers, but "working papers"; plaintiff says the purchase *order* received from Burlington is the "offer." Barmag seeks to support this argument by referring to the terms of Burlington's purchase order which says that it is an offer and by referring to the sentence on page 13 of the April 8, 1975, quotation, paragraph two, which says "An order shall be regarded as accepted only after being confirmed by the seller's written order confirmation."

Burlington's subsequent purchasing order does not convert the June 13, 1975, quotation into a "working paper." The terms in that quotation are complete, and the buyer reasonably understood the quotation to be an offer. Likewise, the sentence buried in a paragraph labeled "quotations" on page 13 of the April 8, 1975 quotation does not change the character of the document as an offer. For example, in the cover letter to the April 8, 1975 quotation, de Haas says:

Ed Robbins mentioned a quantity of two (2) machines, however, we have taken the liberty of expanding this to 25 as it was tied into an agreement reached last year in Germany. At that time we mentioned that if machines are ordered in May, 1975, the 1975 price would be good for the first 25 machines delivered per quoted schedule.

On the last page of the June 13, 1975 cover letter, de Haas says, "We trust that with the above information and quotation you are in a position to release the order in one week to ten days, upon which we can start manufacturing of the FK6–SS." Indeed, American Barmag placed the order for Burlington on June 30, 1975, before receiving the confirming purchase order, because no question remained that Burlington would order the two machines. While the deal was not formally complete, there is no question that the *offer* existed before June 30, 1975.

### B.

#### The assembly patented in the '159 patent was embodied in the machines offered for sale to Burlington.

The product for sale and the patented invention need not be exactly the same for the patent to be invalid under 35 U.S.C. § 102(b). *General Electric Co. v. United States,* 654 F.2d at 58; *In re Corcoran,* 640 F.2d at 1333. A patent is invalid if the differences between the product on sale and the invention claimed do not themselves amount to an invention; that is, the

differences do not go to the essence of the patented item. *Timely Products Corp. v. Arron,* 523 F.2d at 302; *Application of Foster,* 343 F.2d 980, 989, 52 CCPA 1808 (Cust. & Pat.App.1965), *cert. denied,* 383 U.S. 966, 86 S.Ct. 1270, 16 L.Ed.2d 307 (1966).

Hermann Kubler, the inventor of the patented assembly, believes that the key feature of his invention is the introduction of a bend in the yarn path, the acute angle between the heater and the cooling zone (Dep. pp. 85–86). That feature obviously is contained in the machines offered to Burlington as demonstrated in the pictures sent to Burlington in March 1975, and in the description contained in the quotations:

> The FK6–SS has a primary heater of 2000 mm length. This heater is arranged under an angle, extending from the top of the supply creel at 180 cm level to the top of the machine at 310 cm level. A cooling plate system of 900 mm length is vertically arranged.

June 13, 1975 quotation, p. 2 (Defendants' Exhibit 12). Further, Edwin Robbins of Burlington testified that the machine that he saw at the demonstration in June, 1975, is accurately represented schematically by Figure 1 of the '159 patent application (Dep. pp. 90–93).

In a carefully detailed and documented analysis of this issue, defendants demonstrate for each claim in the '159 patent the corresponding feature in the June 13, 1975, quotation and the sample machine tested by Burlington personnel in Germany.

At the hearing, plaintiff could point to no evidence that shows the item patented was different from the sample machine constructed in 1975.

Even after having several additional weeks in which to find such evidence in the record, plaintiff points to none.

■ Plaintiff does claim that changes were made in the machine after the tests performed in June 1975, such as relocating the heater, narrowing the width of the machine, redesigning the heater, moving the creel, and relocating the feed rolls—but at no point does plaintiff indicate that any of these changes go to the essence of the invention, or that the changes amount to inventions themselves. In fact, the '159 patent places no limitations on the width of the machine, the type of heater used, the specific angle of the heater, or the specific location of the creel and feed rolls. Each and every element claimed in the patent was contained in the low-profile machine offered for sale to Burlington.

## C.

*The device claimed in the '159 patent was reduced to practice and operable before June 30, 1975.*

Reduced to practice means "the stage in invention development when the invention has been reduced to a sufficiently tangible form to demonstrate that it will work for its intended purpose." *General Electric Co. v. United States,* 654 F.2d at 62. The former Court of Customs and Patent Appeals held that to prove a reduction to practice "all that must be shown is that the invention is suitable for its intended purpose. [Citations omitted.] There is no requirement for a reduction to practice that the invention, when tested, be in a commercially satisfactory stage of development." *Randolph v. Shoberg and Ulicny,* 590 F.2d 923, 926–927 (Cust. & Pat.App.1979); *In re Dardick,* 496 F.2d 1234, 1238 (Cust. & Pat.App.1974); *In re Anthony,* 414 F.2d 1383, 1396 (Cust. & Pat.App.1969); *Voisinet v. Coglianese,* 455 F.2d 1064, 1068 (Cust. & Pat.App.1972).

The sample machine which embodied Kubler's invention was fully operable by May 1, 1975. On May 1, 1975, Barmag sent Burlington several fabric samples composed of yarn processed on the machine.

■ Plaintiff contends that the yarn produced by the sample machine in May 1975 was "deficient in two important respects." This contention is based on Heinz Treptow's testimony that:

> "Their [Burlington's sample yarn] tenacity is higher. Their elongation is higher but in respect to crimp we are better than their sample. So partially we ex-

ceeded their [yarn] requirements. Partially we had to do something." (Dep. pp. 55–56).

Imperfections in the samples produced in May do not mean that the machine would not work for its intended purpose. Joe London, a processing engineer at Burlington who is now manager of corporate research and development, testified that the samples indicated the machine had "good prospects of duplicating or making yarns near our current product." (Dep. p. 12.)

Whatever problems existed with the yarn processed in early May, Barmag considered the machine to be sufficiently reduced to practice to invite Burlington personnel to conduct intensive tests on the machine in Germany. The machine was sufficiently operable that nine days of such tests were conducted from June 2 to June 16, 1975.

After the testing in June, Karl Bauer, head of Barmag's research and development department, testified that "the results showed results of a quality which we almost didn't dare to hope" (Dep. p. 25). Joe London, the Burlington yarn process engineer who conducted the tests, concluded after the testing that the heating and cooling elements in the machine would work satisfactorily (Dep. pp. 25–26).

Plaintiff makes much of Edwin Robbins' reference at one point to the machine as a "Rube Goldberg." While Robbins says that he would not characterize the machine as a prototype, he goes on to say that the machine was operating properly, that the arrangement of heating and cooling elements was acceptable, and that "we left pretty well convinced we had a pretty well designed machine that could *operate commercially."* (Dep. pp. 102–103.)

■ Plaintiff argues that the machine was not reduced to practice because further tests on yarn had to be run and changes were made in the machine after the tests. Improvements or refinements in a machine do not imply that the machine was not previously reduced to practice. *Farrand Optical Co. v. United States,* 325 F.2d 328, 332 (2d Cir.1963); *Steinberg v. Seitz,* 517 F.2d 1359, 1363 (Cust. & Pat.App.1975).

The tests in June established that the novel arrangement of the heating and cooling elements would produce quality yarn at high speeds. Based on those tests, Burlington Industries was willing to spend three quarters of a million dollars to purchase two of the machines; it is difficult to believe Burlington would invest that amount of money in machinery that was not reduced to practice and suitable for its intended purpose.

### D.

The device claimed in the '159 patent was on sale for profit, not for experimentation.

■ "The experimental exception applies only if the commercial exploitation is merely incidental to the primary purpose of experimentation to perfect the invention." *In re Theis,* 610 F.2d 786, 793 (Cust. & Pat. App.1979). *Accord, Cali v. Eastern Airlines, Inc.,* 442 F.2d 65, 70 (2d Cir.1971); *Kock v. Quaker Oats Co.,* 681 F.2d 649, 652 (9th Cir.1982).

The interactions between Burlington and Barmag are characteristic of *sales,* not experiments. Harry de Haas, Barmag's sales representative, describes the meetings as "typical sales meetings." (Dep. pp. 9, 14, 38.) The two quotations talk about price increases for delays in orders, discounts, and down payments—they talk of sale, not experimentation. Edwin Robbins testified that the sale was considered by Burlington to be an "outright purchase"—not an experimental installation (Dep. pp. 110–111). That Burlington was not aware of any experimental purpose is particularly relevant:

> The motivating force for the experiments will normally come from the inventor, but if the buyer does not have reason to know of the experimental purpose, it is unlikely, under the rules cited in the text, *supra,* that a court will either.

*Kock v. Quaker Oats Co.,* 681 F.2d at 658, n. 7.

Further, the traditional indicia of experiments are conspicuously absent. Plaintiff did not require Burlington to submit performance reports on the machine as a condi-

tion of sale; Burlington was not required to keep its knowledge of the machine confidential. No restrictions were placed on Burlington's use or control of the two full production machines.

Plaintiff contends the sale was for experimental purposes because the machine underwent further testing by Burlington. Continued testing and modification will not change a sale for commercial purposes into a sale for experimental purposes where the tests are for making commercial refinements rather than for establishing an invention's viability:

> Super Mold argues that since the machine was modified, it follows that its use, prior to the modifications, was purely experimental. We find no merit in this argument. None of the modifications were of such significance to prompt Fike to describe them or claim them in his patent application. Unless such improvements would themselves be patentable, they do not necessarily suffice to bring within the experimental exception an invention which has otherwise traversed the statutory bounds of the exception [citations omitted].

*Super Mold Corp. v. Clapp's Equipment Division, Inc.,* 397 F.2d 932, 935 (9th Cir.1968). *Accord, In re Theis,* 610 F.2d at 792. None of the testing or changes made after June 30, 1975, are the basis for claims in the patent application; the modifications were efforts to improve the invention's performance, not establish its viability.

■ Plaintiff argues that since it expected a loss of 1.9% on the two full production machines, and actually incurred a loss of over 9%, that Burlington's use was experimental. While profit demonstrates commercial exploitation, the absence of profit does not demonstrate experimentation. *In re Dybel,* 524 F.2d 1393, 1401 (Cust. & Pat. App.1975). A loss may only be a "loss leader" in an effort to attract business:

> Gillette did not pay for the preliminary cans it received but that does not make it an experiment. The evidence demonstrates it was all part of a sales effort with American anticipating a profitable future.

*American Can Co. v. Crown Cork & Seal Co.,* 693 F.2d 653, 657 (7th Cir.1982). As demonstrated in the memoranda from the early meetings and the quotations, Barmag expected orders for many machines beyond the first two full production models.

Plaintiff points to no evidence in the record that personnel at Barmag intended the sale to Burlington to be for experimental purposes, rather than for commercial exploitation. Aside from a difference in height, the machines sold to Burlington after the first two had the same overall design (Robbins Dep. p. 23). Also, Barmag points to no evidence to show that it required the financial support of Burlington to proceed with the evaluation of the slanted heater machine.

Based on the evidence in the record, this court finds that there is no genuine issue of material fact. The assembly described in the '159 patent is the machine offered for sale to Burlington in the quotations and meetings that occurred before June 30, 1975. The sale was for commercial exploitation of the invention which had been shown to be operable and commercially viable.

■ As a matter of fact and a matter of law, this court finds that Patent No. Re 30,159, held by plaintiff Barmag, is invalid under 35 U.S.C. § 102(b) because the device claimed in the patent was "on sale" in the United States more than one year before the patent application was filed. Accordingly, defendants' motion for summary judgment is allowed.