**MICRO–MAGNETIC INDUSTRIES, INC.,
a corporation, Plaintiff-Appellant,**

v.

**ADVANCE AUTOMATIC SALES CO.,
INC., et al., Defendants-Appellees.**

No. 72–2733.

United States Court of Appeals,
Ninth Circuit.

Nov. 6, 1973.

Carl Hoppe (argued), San Francisco, Cal., Edwin W. Oldham, Akron, Ohio, for plaintiff-appellant.

Karl A. Limbach (argued), of Limbach, Limbach & Sutton, San Francisco; Feldman, Waldman & Kline, San Francisco, Cal., for defendants-appellees.

Before CHAMBERS and DUNIWAY, Circuit Judges, and SKOPIL,* District Judge.

### OPINION

DUNIWAY, Circuit Judge:

This is a cross-appeal in a suit for patent infringement. See Micro-Magnetic Industries v. Advance Automatic Sales Co., 9 Cir., 1973, 488 F.2d 770. Micro-Magnetic Industries, the plaintiff below, appeals from a summary judgment holding that its U. S. Patent No. 3,256,968 (the Riddle patent) is invalid as a matter of law. We reverse.

The relevant facts are as follows: In 1960 Micro-Magnetic was formed as a sole proprietorship by John Riddle in order to develop and market currency recognition devices for use in vending machines. The original device produced by Micro-Magnetic was a magnetic validator, which distinguish genuine bills by means of magnetic properties of the ink used to print them. In October, 1961 Riddle and one of his engineers conceived of an optical validator, a device

* The Honorable Otto R. Skopil, United States District Judge for the District of Oregon, sitting by designation.

which could "visually recognize" bills. *See generally* Micro-Magnetic Industries v. Advance Automatic Sales Co., *supra,* 488 F.2d at 770. They immediately began working to develop the optical validator, and a prototype of the device upon which the Riddle patent was eventually obtained was assembled in early 1962.

Also in early 1962 Riddle began to have financial difficulties. He thereupon entered into negotiations with Borg-Warner Corporation, and on March 9, 1962, a contract was signed which in essence gave Borg-Warner an option to purchase the assets of Micro-Magnetic. Under the contract, Riddle was to receive $10,000 immediately, and additional payments totalling nearly two million dollars if the sale were consummated. In return, Borg-Warner was to receive "inventions, patent applications, patent rights, trademark(s) (if any), copyrights (if any), drawings, prints, sketches, specifications, manuals, related written material, models, inventory, parts and equipment," and any other "properties used in the business known as Micro-Magnetic Industries." Pursuant to the contract, Riddle sent a number of items to Borg-Warner for its inspection, including the prototype optical validator. On April 5, 1962, Borg-Warner exercised its option to terminate the agreement, and all of Micro-Magnetic's property, including the prototype, was returned to Riddle. He and his co-inventor eventually applied for a patent on the optical validator on August 13, 1963.

Based upon these facts, the district court concluded that the Riddle patent was invalid under the terms of 35 U.S.C. § 102(b), which provides in pertinent part:

"A person shall be entitled to a patent unless—

. . . . . .

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, . . .".

■ Micro-Magnetic advances two grounds for reversal. First, it argues that although the contract between Riddle and Borg-Warner would have transferred title to the optical validator, the transaction was in reality merely a means of reorganizing a business which was in financial distress. It argues that section 102(b) was not intended to apply to every such sale of a business. We agree.

■ The policy underlying the public use and on sale bars to patentability is to prevent an inventor "from extending the period of his monopoly by exploiting his invention before his application for a patent." Pickering v. Holman, 9 Cir., 1972, 459 F.2d 403, 406 (citing cases). The considerations which dictate a decision to reorganize a business and the form that such reorganization may take are varied, and are not necessarily inconsistent with this goal. *See generally* H. Henn, Law of Corporations §§ 16, 17 (2d ed. 1970). The injection of new capital into an inventor's business may facilitate the eventual commercial exploitation of any inventions upon which he is working, but this is no more true when the form of refinancing is a sale of assets or merger than when the inventor takes in a partner, issues or sells stock, or merely obtains a loan. Thus, we refuse to attach definitive significance to the fact that the optical validator, as one of Micro-Magnetic's many assets, was to be sold under Riddle's contract with Borg-Warner. Merely entering into that arrangement did not automatically trigger section 102(b).[1]

On the other hand, in some cases a proposed sale of an inventor's business may amount to little more than the sale of one or more specific inventions or

---

1. Defendants urge that "the sale of the whole is always equivalent to the sale of the individual parts" for purposes of section 102(b). However, the cases which it cites for this proposition all involve situations in which the invention was a working part of a

machines of which they are a part. In such circumstances the inventions themselves would be on sale within the literal meaning of section 102(b). On the record before us, we are unable to determine whether Riddle and Borg-Warner intended that this be such a sale. When the contract was made, Micro-Magnetic was an ongoing business producing and marketing magnetic validators and it now asserts that the optical validator idea was a small part of its assets. However, it also claims that the optical validator was a major breakthrough in the field of currency recognition devices, and the prototype was demonstrated to Borg-Warner personnel after the contract was signed. Thus, far more needs to be known regarding the course of dealing between Riddle and Borg-Warner in order to determine the motivation for the sale of Micro-Magnetic's assets. The issue was therefore inappropriate for summary judgment.

■ Summary judgment was inappropriate for a second reason. Even though an invention falls within the express terms of section 102(b) by being in public use or on sale more than one year prior to the filing of a patent application, such sale or use will not invalidate the patent if it was primarily for experimental purposes. *See* Smith & Griggs Mfg. Co. v. Sprague, 1887, 123 U.S. 249, 8 S.Ct. 122, 31 L.Ed. 141; Elizabeth v. Pavement Co., 1877, 97 U.S. 126, 24 L. Ed. 1000; Pickering v. Holman, supra. We have held that whether a particular use or sale is experimental is a question of fact. *See* Cataphote Corp. v. DeSoto Chemical Coatings, Inc., 9 Cir., 1966, 356 F.2d 24, 26, modified on other grounds 358 F.2d 732, cert. den. 385 U. S. 832, 87 S.Ct. 71, 17 L.Ed.2d 67; Willamette-Hyster Co. v. Pacific Car & Foundry Co., 9 Cir., 1941, 122 F.2d 492, 497.

We have recently articulated the following rule regarding the appropriateness of summary judgment when a claim of "experimental sale" is made:

"A sale or an offering for sale precludes any inquiry into the experimental nature of the sale *unless* the contract of sale or the offering for sale contains an express or clearly implied condition that the sale or offering is made primarily for experimental use.

Thus the sale or offering would not ipso facto invalidate the patent nor preclude further inquiry into the experimental nature of the use where the contract or the offer stated that the sale was for experimental purposes . . .; or showed that the device was still experimental and that no workable prototype had been made . . .; or required that the invention should be kept confidential or from public view, or that reports on the use of the invention should be supplied to the inventor . . .; or other similar statements appeared from which it could clearly be implied that the sale or offering was made for an experimental purpose." The Robbins Co. v. Lawrence Mfg. Co., 9 Cir., 1973, 482 F.2d 426 at 433.

■ Even assuming that Riddle's contract with Borg-Warner amounted to placing the optical validator itself on sale, there is a question of fact as to whether the offer was conditioned upon further experimentation. The contract expressly provided that, in the event that the sale was consummated, Borg-Warner was to budget $250,000 per year for research and development of Micro-Magnetic's products, and it is undisputed that the deal was to include a five-year employment contract for Riddle. Moreover, although the prototype was assembled and demonstrated to Borg-Warner shortly after the contract was entered into, Riddle testified in his deposition that it varied significantly from

---

larger machine and it was merely fulfilling its intended use. *E. g.*, Koehring Co. v. National Automatic Tool Co., 7 Cir., 1966, 362 F. 2d 100; Monroe Auto Equipment Co. v. Superior Industries, 9 Cir., 1964, 332 F.2d 473, 483–485. Such cases do not apply to the facts before us. Moreover, we observe that, even in such cases, section 102(b) does not automatically apply, even if the sale is not for experimental purposes. *See, e. g.*, Watson v. Allen, 1958, 103 U.S.App.D.C. 5, 254 F. 2d 342.

the device which was eventually patented, and the extent of the demonstration was to distinguish genuine one dollar bills from play money. Nothing in the record enables us to evaluate the significance of such a test. Thus, even if it is determined that the optical validator was on sale, the rule in *The Robbins Co.* requires further hearings in this case to resolve the question of whether the purpose of the contract was experimental or "to exploit the invention and gain a competitive advantage over others." Pickering v. Holman, *supra*, quoting Solo Cup Co. v. Paper Mach. Corp., E. D.Wis., 1965, 240 F.Supp. 126, 131.

Reversed and remanded.