Bruce A. KOCK, Plaintiff-Appellant,

v.

The QUAKER OATS COMPANY, et al.,
Defendants-Appellees.

No. 80–4072.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 12, 1981.

Decided July 15, 1982.

Rehearing Denied Aug. 23, 1982.

Sidney F. DeGoff, DeGoff & MacGowan, San Francisco, Cal., for plaintiff-appellant.

Lawrence Rosenthal, Blum, Kaplan, Friedman, Silberman & Beran, New York City, for defendants-appellees.

Before WALLACE, KENNEDY, and PREGERSON, Circuit Judges.

KENNEDY, Circuit Judge:

The appeal comes from a patent infringement suit where the trial court, within the confines of a summary judgment motion, determined the patent invalid. The court ruled that 35 U.S.C. § 102(b) (1976) operates to invalidate the patent because the invention had been on sale for longer than one year before the date of the patent application. All concede that certain rights to the invention were transferred by an agreement executed more than a year before the patent application. The inventor argues that the transfer was for an experimental purpose and so not within the bar of the cited statute, while the defendant in the infringement suit argues the contract was a sale not limited to that purpose. We agree that summary judgment must be entered for the defendant below based on the cited statute, although on reasoning somewhat different from that of the court below, and we affirm.

Bruce A. Kock, the inventor in this case, was the plaintiff below and is appellant here. Kock undertook a project for Merry Manufacturing Company (Merry). Kock was to be paid one thousand dollars "for the development and building of one working prototype toy watch movement, exclusively for Merry Manufacturing Company." The toy watch had to be accurate, tick when running, run for one hour per winding, be easily assembled, and be marketable at one dollar retail, allowing for a thirty percent profit margin.

Kock came up with a prototype he thought met these specifications. On April 28, 1967, Kock and the Company signed the agreement here in question.[1] One clause

---

1. The relevant provisions of the contract state:

"1. The INVENTOR hereby sells, assigns, and transfers all rights to his novelty toy watch movement and any invention embodied therein to the COMPANY.

"2. At the time of execution of this agreement, the INVENTOR shall deliver to the COMPANY the working prototype toy watch movement developed in accordance with the letter agreement, and the COMPANY shall pay to the INVENTOR the sum of [$1,500]. The COMPANY shall pay to the INVENTOR the sum of [$1,000] for each subsequent watch movement requested of INVENTOR by the COMPANY, but the inventor shall not be obligated to supply any such additional movements.

"3. Within [90 days] of the execution of this AGREEMENT, the COMPANY shall, in its own exclusive judgment, determine whether or not commercial production of a toy watch in accordance with the prototype delivered as specified above is desirable. If such production is, in the exclusive judgment of the company desirable, the company shall notify inventor, and shall pay to INVENTOR the sum of [$1,800] as an advance against the royalties provided hereinafter....

"10. All improvements and changes in design shall be submitted to the INVENTOR by the COMPANY. Such submissions to INVENTOR are for his information only, and it is to be understood that the COMPANY may make any change in design which in its judgment is desirable....

"12. INVENTOR shall be available to the COMPANY for consultation on seventy-two (72) hours notice. Such consultation shall be at no expense to INVENTOR and shall be for

states, "The INVENTOR hereby sells, assigns and transfers all rights to his novelty toy watch movement and any invention embodied therein to the [Merry] COMPANY." The agreement supplies the basis for the contention of the alleged patent infringers that the patent was void under section 102(b). The district court granted summary judgment for the defendants, reasoning, first, that under *Robbins Co. v. Lawrence Mfg. Co.*, 482 F.2d 426 (9th Cir. 1973), the court may not look beyond the four corners of the written contract in search for an experimental purpose, and second, that the experiments undertaken by Merry were commercial and so not the sort within the experimental purpose exception to the on sale bar of section 102(b).

We begin by exploring the history and rationale of the on sale bar and the experimental purpose exception to it.

35 U.S.C. § 102(b) (1976) states:

A person shall be entitled to a patent unless . . . (b) the invention was patented or described in a printed publication in this or a foreign country *or in public use or on sale* in this country, more than one year prior to the date of the application for patent in the United States. (Emphasis added.)

The public use or on sale bar has been part of patent law in some form since 1836. The last amendment to section 102(b) occurred in 1939, when Congress shortened the grace period from two years to one year. Act of August 5, 1939, ch. 450, § 1, 53 Stat. 1212. *See generally* 2 D. Chisum, *Patents: A Treatise on the Law of Patentability, Validity and Infringement* § 6.02 (1979) at 6–5 to 6–16.

The one year grace period gives inventors an incentive to pursue diligently the patent process after their invention is ready for commercial application. This serves to limit the monopoly to the statutory period, *Pickering v. Holman*, 459 F.2d 403, 406 (9th Cir. 1972), and also encourages inventors to place their handiwork in the public domain as soon as possible so all may benefit from it. *Pennock v. Dialogue*, 27 U.S. (2 Pet.) 1, 19, 7 L.Ed. 327 (1829); *Gould Inc. v. United States*, 579 F.2d 571, 580 (Ct.Cl.1978); *Atlas v. Eastern Air Lines, Inc.*, 311 F.2d 156, 159 (1st Cir. 1962), *cert. denied*, 373 U.S. 904, 83 S.Ct. 1290, 10 L.Ed.2d 199 (1963). *See also* Note, New Guidelines for Applying the On Sale Bar to Patentability, 24 *Stan.L.Rev.* 730, 732–736 (1972).

Not all transfers from an inventor to a third party trigger the bar of section 102(b). If a transfer is made for the dominant purpose of experimentation, that is, to perfect the invention, and only incidentally for the profit of the inventor, then there is no public use or sale within the meaning of the statute.

The classic case for the experimental use exception is *City of Elizabeth v. American Nicholson Pavement Co.*, 97 U.S. 126, 24 L.Ed. 1000 (1878):

It is sometimes said that an inventor acquires an undue advantage over the public by delaying to take out a patent, inasmuch as he thereby preserves the monopoly to himself for a longer period than is allowed by the policy of the law; but this cannot be said with justice when a delay is occasioned by a *bona fide* effort to bring his invention to perfection, or to ascertain whether it will answer the purpose intended . . . [I]t is the interest of the public, as well as himself, that the invention should be perfect and properly tested, before a patent is granted for it.

---

periods not exceeding three (3) days. In the event INVENTOR's consulting services are required by the COMPANY more than once during any calendar year, he shall be compensated for his services at the rate of [$100] per day, including travel time, for all consultation after the first period requested."

Other provisions of the contract discuss royalties, automatic expiration in event of insolvency, and the obligation of the company to secure a patent for Kock. This last provision states that if the company commences commercial production, "the COMPANY shall research patent aspects of the watch movement and endeavor to patent all patentable features thereof" and "diligently" and "actively pursue" all necessary steps to obtaining a patent for Kock. Clause 4.

Any attempt to use it for a profit, and not by way of experiment, for a longer period than two years [the grace period at that time], would deprive the inventor of his right to a patent.

*Id.* at 137. Thus, *City of Elizabeth* held that "the use of an invention by the inventor himself, or of any other person under his direction, by way of experiment, and in order to bring the invention to perfection" was not a public use within section 102(b). *Id.* at 134.

The experimental purpose exception applies to the sale of an invention under § 102(b), just as it does to its use. Although the Supreme Court has never had occasion to so hold, we think the law is clear on the point. *Robbins Co. v. Lawrence Mfg. Co.*, 482 F.2d 426, 430 (9th Cir. 1973); *Red Cross Mfg. Corp. v. Toro Sales Co.*, 525 F.2d 1135, 1144 (7th Cir. 1975); *In re Yarn Processing Patent Validity Litigation*, 498 F.2d 271, 277 (5th Cir. 1974), *cert. denied*, 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974); *see generally* Chisum, *supra*, section 6.02[6], [7].

■ To insure that abuses section 102(b) is designed to prevent do not arise, the burden of proof that sale is for an experimental purpose is on the inventor. The Supreme Court so indicated in *Smith & Griggs Mfg. Co. v. Sprague*, 123 U.S. 249, 8 S.Ct. 122, 31 L.Ed. 141 (1887):

In considering the evidence as to the alleged prior use for more than two years of an invention which, if established, will have the effect of invalidating the patent, and where the defense is met only by the allegation that the use was not a public use in the sense of the statute, because it was for the purpose of perfecting an incomplete invention by tests and experiments, the proof, on the part of the patentee, the period covered by the use having been clearly established, should be full, unequivocal, and convincing.

*Id.* at 264, 8 S.Ct. at 129; *see also Omark Industries, Inc. v. Carlton Co.*, 652 F.2d 783, 787 (9th Cir. 1980); *Aerovox Corp. v. Polymet Mfg. Corp.*, 67 F.2d 860, 861 (2d Cir. 1933).

The appellees argue, and the district court agreed, that the testing which oc-

curred in this case, even if it was the purpose for the sale, was "that of a trader, not of an inventor." They insist that the experimentation required to stop the running of the time period is limited to determining the operability of the patented invention itself. We think that is too narrow a formulation.

■ In determining whether the transfer fell within the statutory exception, or the closely related question whether the pleadings presented a triable issue of fact on the point, we must examine the distinction between tests and research for experimental purposes and those for commercial purposes. The dichotomy may not be easy to apply since experimentation, for most inventors, is only a means to later commercial exploitation. The precedents allow such a distinction to be stated, however. Where the purpose of a sale is to investigate or stimulate the demand for the product, the object of the transfer is deemed commercial, not experimental, and the exception does not apply. Such a sale is within the bar of section 102(b). *Omark Industries, Inc. v. Carlton*, 652 F.2d 783, 787–88 (9th Cir. 1980); *Kalvar Corp. v. Xidex Corp.*, 556 F.2d 966, 967–68 (9th Cir. 1977); *Cataphote Corp. v. DeSoto Chemical Coatings, Inc.*, 356 F.2d 24, 27 (9th Cir. 1966), *aff'g*, 235 F.Supp. 931 (N.D.Cal.1964), *cert. denied*, 385 U.S. 832, 87 S.Ct. 71, 17 L.Ed.2d 67 (1966); *Paeco, Inc. v. Applied Moldings, Inc.*, 562 F.2d 870, 874–75 (3d Cir. 1977); *Dart Industries, Inc. v. E. I. Dupont DeNemours & Co.*, 489 F.2d 1359, 1366 (7th Cir. 1973).

■ On the other hand, where the purpose of the sale, as revealed by objective circumstances, is to determine whether the invention can be improved, or reduced to operable, manufacturable, and useful form, a valid experimental purpose exists.

When an invention has been reduced to practice, further public testing and demonstration may well support an inference that the inventor's intent is to exploit the invention, but "there may be an experimental use even following reduction to practice where the experiments are an attempt to further refine the device."

*Del Mar Engineering Laboratories v. Physio-Tronics*, 642 F.2d 1167, 1169 (9th Cir. 1981), quoting *Cataphote Corp. v. DeSoto Chemical Coatings, Inc.*, 235 F.Supp. 931, 934 (N.D.Cal.1964). " '[A]n inventor may . . . wait until he learns whether his invention is of enough value to justify an application for a patent.' " *Yarn Processing*, 498 F.2d at 282, quoting *Aerovox Corp. v. Polymet Manufacturing Corp.*, 67 F.2d 860, 862 (2d Cir. 1933). As the Fifth Circuit held in *Yarn Processing*, "a public use or sale will be excused if the invention is still undergoing experimentation that is reasonably necessary to test its utility or to determine whether further refinement is needed." *Id.* at 285. The Second Circuit is in accord. *Cali v. Eastern Airlines, Inc.*, 442 F.2d 65, 70–71 (2d Cir. 1971). *See generally* Chisum, *Patents Treatise* § 6.02[7] at 6–52 to 6–56.

Appellees suggest that the prototype delivered to Merry was identical with the movement later identified in the patent application. The issue, however, is not whether experimentation found that the prototype was sufficiently workable to be patentable without further change, but whether such experimentation took place at all. There are some cases intimating, although none that we have found holding, that the limits of permissible experimentation are defined by the limits of the eventual patent claims. *E.g.*, *Application of Theis*, 610 F.2d 786 (Cust. & Pat.App.1979); *Minnesota Mining and Mfg. Co. v. Kent Industries*, 409 F.2d 99 (6th Cir. 1969). In both of those cases, there was commercial purpose so a correct result was achieved, despite a possibly over narrow view of "experimental purpose." In *Minnesota Mining and Mfg. Co.*, the inventor distributed samples to prospective purchasers and "conducted a substantial sales program." 409 F.2d at 100. In *Theis*, there was little, if any, objective evidence of experimental purpose, and the court found "the context in which all of appellant's activities in the period immediately preceding the critical date exist is

clearly that of an attempt at market penetration." 610 F.2d at 793.

■ The dictum in these cases is thus at odds with our own view, and with the broad scope of experimentation the Supreme Court allowed in the *City of Elizabeth* case, *supra.* To the extent there is a conflict, we adopt what Chisum calls the "better and prevailing view." *Patents Treatise* at 6–53. Experimentation may occur even if no change in the patent proves to be necessary. *See City of Elizabeth*, 97 U.S. at 134–35; *Yarn Processing*, 498 F.2d at 277. Even if tests are not directly relevant to the claims eventually put forward in the patent, such tests are within the "experimental purpose" exception if their purpose is to determine whether the invention is sufficiently useful to justify a patent or could be improved.

Absent a transfer or use, an inventor may determine when to apply for a patent. An inventor with adequate financing may perfect and refine his invention for a lifetime, if that is his wish. The inventor of more limited means should also be able to test and refine his work before filing for a patent, even if he must sell an interest in the invention to develop a product with which he is fully satisfied, provided always the dominant purpose of the sale is for experiment, and that the transferee may not exercise the right to exploit or use the invention.

■ As we said in *Pickering v. Holman*, 459 F.2d 403, 406 (9th Cir. 1972), "the so-called 'experimental purpose exception,' [v]iewed in light of the policy underlying the public use provision . . . is no exception at all. A bona fide experimental use involves no commercial exploitation." The same could be said of a sale made to improve or perfect the invention. In such a case, where the profit motive is only incidental to the experimental, the goals of section 102(b) would not be served by applying the on sale bar.[2]

---

**2.** It is settled, since the Supreme Court's *Smith & Griggs* case, 123 U.S. 249, 266, 8 S.Ct. 122, 130, 31 L.Ed. 141 (1887), that the inventor is entitled to profit incidentally from a sale for experimental purposes. As we perceive the

meaning of this rule, so long as there is an experimental purpose for the sale, the sale is not within the bar of section 102(b) no matter how profitable for the inventor it may be. *See*

In this case, the affidavits of the inventor in opposition to summary judgment stated that:

> When I sold the prototype to Merry, it was for research and study. We did not know at the time that the prototype would be in its final form. It was only after considerable study and work on my part, and research on Merry's part, that the prototype was adopted as the final form of the toy watch that would be offered for sale to the public.

This would support the view that Kock's purpose in transferring the invention to Merry was to see if the invention could be improved, or if it was worth patenting in its present form.

■ An inventor must do more than allege his experimental goals to avoid the statutory bar, however. As we said in *Robbins*, "an inventor's testimony of his subjective intent has no probative force against overwhelming evidence to the contrary." 482 F.2d at 431. Thus, where a prima facie sale has been proven, to come within the exception it is the inventor's burden to produce clear and objective evidence of experimental purpose as the law defines it. *Robbins, id.; Omark Industries,* 652 F.2d at 787.

■ Whether a sale is made for an experimental purpose may turn on many factors. Relevant considerations include the necessity for the inventor to transfer the design to an entity with resources or knowledge superior to the inventor's, or similar factors tending to show the inventor transferred to obtain development assistance; the need to protect the public safety by limited and cautious experiments, *e.g., Del Mar Engineering Laboratories* ; the stage of completion of the prototype sold; whether reports of the results of the tests or experiments are to be made to the inventor; and whether confidentiality by the buyer is enforced or expected.

■ It is not, however, enough that an inventor demonstrates by objective evidence that further experiment was necessary and was in fact performed by the transferee. To avoid the on sale bar, the inventor must further show that the transferee lacked authority to use the invention or exploit its commercial value. Where an inventor makes a simple outright sale, with the buyer to manufacture, refine, or sell the invention as the buyer chooses, and with no enforceable obligation on the buyer to hold the invention or design for experimental purpose only, the sale is for profit and, if made before the critical date, will invalidate the patent.

■ If the invention is out of the inventor's hands, it is irrelevant what experiments the buyer does or does not do with the invention. *Tool Research and Engineering Corp. v. Honcor Corp.,* 367 F.2d 449, 453 (9th Cir. 1966), *cert. denied,* 387 U.S. 919, 87 S.Ct. 2032, 18 L.Ed.2d 972 (1967); *Dart Industries, Inc. v. E. I. DuPont De-Nemours & Co.,* 489 F.2d 1359, 1366–67 (7th Cir. 1973), *cert. denied,* 417 U.S. 933, 94 S.Ct. 2645, 41 L.Ed.2d 236 (1974); *Cali v. Eastern Airlines, Inc.,* 442 F.2d 65, 69 (2d Cir. 1971).[3] The Supreme Court in the *City of Elizabeth* case recognized this by requiring that tests made by one other than the inventor be "under his direction" if there is to be an experimental purpose. 97 U.S. at 134. To quote the Court in *Egbert v. Lippmann,* 104 U.S. 333, 336, 26 L.Ed. 755 (1881), if an inventor "gives or sells [his invention] to another, to be used by the

generally Chisum, *Patents Treatise* § 6.02[7] at 6–59 to 6–64.

**3.** We note that while the court in *Cali v. Eastern Airlines, Inc.,* 442 F.2d 65, 69–70 (2d Cir. 1971), recognized the general rule cited in the text, the court reversed a summary judgment against the inventor, although it appeared that the inventor put no restrictions on the use to be made of his invention by the transferee, in that case his employer. *Cali* is distinguishable in that no "sale" actually occurred; the inventor simply "communicated a raw idea to his superiors for evaluation and exploitation." *Id.* at 69. His financial reward, if any, would be "after it was examined, tried, and ultimately adopted" by his employer. *Id.* It may also be that separate rules apply to the employment relation at issue in *Cali* than to the arms length transaction at issue here. Further consideration of the point can await a more appropriate case.

donee without limitation or restriction, or injunction of secrecy," there is public use (or public sale) within the statute.[4] The inventor in such a case has no control over whether commercial exploitation can begin by the buyer immediately.

█ If the buyer has the authority to use an invention commercially or sell it to others without regard to any duty to experiment further, there is a sale within section 102(b), and the exception for experiment does not apply. It is not enough that the parties do not think it is likely that commercial exploitation will occur. While the limits of permissible experimental purpose are the same in "public use" and "on sale" cases, the relevant question is somewhat different. In "public use" cases, such as *Del Mar Engineering Laboratories*, the inventor has maintained control, and so the question is whether the use *actually made* is within the realm of permissible experimentation. In the case of an actual sale, the issue is what use the buyer *might make* of the invention. If a sale of an invention made before the critical date allows the buyer the possibility of non-experimental use, any patent obtained will be invalid under section 102(b).

█ For reasons that will be stated shortly, we think the inventor has failed to show all of the elements necessary to invoke the exception here, but our analysis differs from that followed by the court below. While the record is not entirely clear on the point, it appears that the court held that in determining whether experimental purpose was shown, the court is confined to the written agreement of transfer. We agree that the written contract is the beginning point of the analysis, and that considered alone it fails to support the existence of experimental purpose as defined by the standards shown above and indeed points strongly against such a conclusion.

The agreement is an archetype of unfortunate draftsmanship, at least from Merry's standpoint. It is entitled "Manufacturing Agreement," and the opening covenant recites a simple sale. The thrust of the entire agreement, arguably, is somewhat broader in that it contemplates that Merry, within ninety days, will determine "whether or not commercial production of a toy watch in accordance with the prototype delivered as specified above is desirable." If so, then Merry is charged to act with diligence to obtain a patent in the inventor's name. There is no express recital of any experimental purpose in the contract.

There was no indication on the face of the agreement that Kock would direct the experiments, or even that Merry would make reports of the tests to Kock. The contract's mention of experiments by Merry thus does not state or clearly imply a permissible experimental purpose.

█ The inventor here appears to argue that the contract was only an offer to sell for ninety days. If the purpose of the offer is not shown to be experimental by other evidence, an offer is also sufficient to put an invention "on sale." *Robbins*, 482 F.2d at 431. *See also Johns-Mansville Corp. v. Certain-Teed Corp.*, 196 USPQ 152 (C.D.Cal. 1977) and *Yarn Processing*, 498 F.2d at 277.

In this case, even if the contract were interpreted so that the buyer had the right to return the invention and rescind the sale if not satisfied with its tests, nevertheless, a transfer for experiment would not necessarily be established. *Application of Theis*, 610 F.2d 786, 789 (CCPA 1979); *Philco Corp. v. Admiral Corp.*, 199 F.Supp. 797, 816–17 (D.Del.1961).

The contract contains provisions which encourage the inference that the invention was patentable and complete at the time of sale, and hence there is no experimental purpose explaining the transfer. The nine-

---

**4.** The inventor argues that the sale here should not be regarded as within section 102(b) since it did not create an opportunity for public use, citing *Galland-Henning Mfg. Co. v. Dempster Bros., Inc.*, 315 F.Supp. 68, 80 (E.D.Tenn.1970) (dictum). We do not approve or disapprove this argument, but we note that the "public use" required by the statute does not have to be very broad, or very public. *See Egbert*, 104 U.S. 333 (1881). For a wry discussion of the case, *see* Chisum, *Patents Treatise*, § 6.02[2](d), at 6–18 to 6–20.

ty day limit for deciding whether commercial feasibility exists does not suggest that the operative prototype itself was still subject to experimentation or testing. The contract did not foreclose the possibility of such experimentation, but there is certainly no clear implication that experiment was the dominant purpose for the transfer.

The contract did state that "all improvements and changes in design shall be submitted to the inventor by the company." Without more, this might have supported an inference of experimentation, but the surrounding contractual language explodes any such argument. "Such submissions to inventor are for his information only, and it is to be understood that the company may make any change in design which in its judgment is desirable." Clause 10. We are unable, within the boundaries of the written contract, to find any clear implication ·of an experimental purpose, and, if the inquiry were to end here, the inventor would be foreclosed without further explanation.

■ The district court erred, however, in holding that evidence of experimental purpose must appear on the face of the contract. It is true that in *Robbins Co. v. Lawrence Mfg. Co.*, 482 F.2d 426 (9th Cir. 1973), we held:

[A] sale or an offering for sale precludes any inquiry into the experimental nature of the sale *unless* the contract of sale or the offering for sale contains an express or clearly implied condition that the sale or offering is made primarily for experimental use.

*Id.* at 433. The rule is, then, that in an on sale case the purpose to experiment must be express or clearly implied in the original agreement of the parties. The contract which courts are charged to interpret in this respect is not limited to the written agreement, except in the polar case of a document conceded to be completely integrated.[5] *Robbins* did not create some new sort of parole evidence rule which bars proving a transfer for experiment by evidence of conduct after the transfer has occurred.

■ As with other questions of contractual interpretation, the conduct of the parties and other evidence of events occurring after the transaction may be relevant to show an intent to transfer for an experimental purpose. It would not be sensible to read *Robbins* as hostile to proof of experimental purpose by objective circumstances relevant to the parties' intent. If between the parties it is clear that the sale is intended as a step on the way to perfecting the invention, and the transferee's rights of use and control are appropriately limited, there may be no particular reason to recite such purpose in a written agreement, if indeed a written agreement exists. The court may not ignore the reality of an experimental purpose where it is shown to exist by objective evidence properly admitted to interpret the contract.[6]

---

5. This would be the case under the California parole evidence rule, as explicated in *Pacific Gas & Electric Co. v. G. W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641 (1968). As the California Supreme Court later said, the task of the trial court in interpreting a contract is to consider "all credible evidence," including "testimony as to the circumstances surrounding the making of the agreement including the object, nature and subject matter of the writing, so that the court can place itself in the same situation in which the parties found themselves at the time of contracting." *Gribaldo, Jacobs, Jones and Associates v. Aggripina Versicherunges A. G.*, 3 Cal.3d 434, 91 Cal.Rptr. 6, 476 P.2d 406, 411 (1970). *See also* Cal.Civ.Code § 1647; Restatement (Second) of Contracts, §§ 202, 223; U.C.C. § 2–202. The approach of federal courts in those cases in which state law is not relevant is the same. *See, e.g., Martin v. Unit-*

ed States, 649 F.2d 701 (9th Cir. 1981); *W. G. Cornell Co. of Washington, D. C. v. United States*, 376 F.2d 299 (Ct.Cl.1967). We need not decide whether to apply the state law approach to contract interpretation, or a federal common law approach based on section 102(b); in this case, the two would lead to the same result.

6. Appellees at oral argument "conceded" that the actions of Merry and the inventor in this case would have been as consistent with a written contract containing boiler plate recitals of experimental purpose, as with the present contract of sale. They nonetheless argue that they were entitled as a matter of law to summary judgment because of the words of the written contract. We do not accept this concession, and search the record for a triable fact issue, but we cite this concession as an indication of the manifest unfairness of adopting any rule such as appellees urge.

In *Robbins*, moreover, we rested in part on the fact that reports of the experimentation alleged in that case were never in fact made from the buyer to the inventor. *Id.* at 430 n.2. This court in *Cataphote Corp. v. DeSoto Chemical Coatings, Inc.*, 356 F.2d 24 (9th Cir.), *cert. denied*, 385 U.S. 832, 87 S.Ct. 71, 17 L.Ed.2d 67 (1966), described the resolution of the question of experimental purpose in an on sale case as depending "principally upon a careful examination of each item of evidence and an evaluation thereof to judge the nature and purpose of the course of conduct of the purported patent holder." *Id.* at 26.[7] *See also Del Mar Engineering Laboratories v. Physio-Tronics, Inc.*, 642 F.2d 1167, 1169 (9th Cir. 1981).

The various aspects of experimental purpose we have outlined can be shown, therefore, by events after the transfer, but in all cases the inquiry is directed to the purpose and intent of the parties at the time the transfer agreement was made. *See, e.g.*, U.C.C. §§ 1–205, 2–205; Restatement (Second) of Contracts §§ 223, 202(4).

It may be that the inventor here presented sufficient evidence to create a triable issue of fact as to part of the required showing of experimental purpose based on the parties' subsequent conduct. There was evidence from which the trier of fact might have found the inventor continued to be involved in design after the date of sale. The invention, while concededly a working prototype at the time of sale, might have undergone further refinements before reduction to useful and manufacturable form.

The pleadings at least admit the possibility the inventor was unable to determine whether the invention was worth patenting, or could be improved, without use of Merry's superior testing facilities.

The defect in the appellant's case, however, is that there is no basis at all for finding that Merry was required to perform further experiments. The agreement must be interpreted to permit Merry to exercise complete control over commercial use and exploitation of the invention, without any obligation to experiment. A limit on the buyer's full dominion over the invention need not be spelled out in terms in the agreement; it might, for example, be implied where the parties clearly contemplated that the inventor, by participating in permissible experiments, would dictate their scope. The agreement at issue here, in particular clauses 3, 10, and 12, makes clear that the inventor waived all control over the future course of the invention. Nothing that would lead us to a contrary opinion was put forward by the inventor. Mere participation as a volunteer, or as a paid consultant, in experiments decided upon by the buyer and under the direction of the buyer is insufficient to show the existence of permissible experimental purpose. Here, Merry was not limited to experimentation and had the absolute right of immediate commercial exploitation. The defendants were, therefore, entitled to prevail.[8] The summary judgment granted them is, accordingly, AFFIRMED.

---

7. Some of our cases speak of the inquiry into experimental purpose as investigating the inventor's intent; others speak of the question as one of contract interpretation. *Compare* the cited language from *Cataphote with Robbins*, 482 F.2d at 433. This conflict is more apparent than real. The motivating force for the experiments will normally come from the inventor, but if the buyer does not have reason to know of the experimental purpose, it is unlikely, under the rules cited in the text, *supra*, that a court will either.

8. Here lies our major disagreement with our dissenting colleague. An inventor who makes an unrestricted sale to a third party, retaining only an interest in future royalties, has made the kind of "sale" which, under 35 U.S.C. § 102(b), requires a patent application be filed within one year to be timely. *See supra* at 655–56. Since all the evidence shows Kock made such a sale, and made no timely application, his tardy patent is invalid. For the same reason, an inventor who has lost all control over the later course of an invention cannot argue that an unrestricted "sale" was a mere "transfer" within his "production or distribution system."

This was not a case where the inventor entered into a joint venture, or where the transfer was to an agent who would only test and refine the invention. It is clear that the buyer here would eventually make commercial use of the invention. We do not hold that transfer to a buyer in such circumstances is automatically within section 102(b). An exception can be

PREGERSON, Circuit Judge, dissenting.

The majority opinion thoughtfully examines the issues involved in determining what constitutes a sale for experimental purposes under 35 U.S.C. § 102(b).[1] The opinion, however, overlooks decisive inferences and case law and frustrates an independent inventor's ability to market his invention and reap the rewards of his creativity. Therefore, I respectfully dissent.

This case is here on appeal from the district court's order granting summary judgment for the defendants. Thus, the primary question before us is whether, after construing all evidence in the light most favorable to plaintiff, the non-moving party, there remains a material question of fact whether the sale of the prototype was for an experimental purpose. Fed.R.Civ. Pro. 56(c); *Pegasus Fund, Inc. v. Laraneta*, 617 F.2d 1335, 1339 (9th Cir. 1980). Since material questions of fact exist, we should remand for trial.

Our court has stated that resolution of the question whether a sale had an experimental purpose depends upon "the totality of evidence presented by both parties, of the nature of the acts committed prior to the critical date and the purpose that motivated the commission of those acts." *Cataphote Corporation v. DeSoto Chemical Coatings, Inc.*, 356 F.2d 24, 26 (9th Cir.), *modified on other grounds and reh'g denied*, 358 F.2d 732, *cert. denied*, 385 U.S. 832, 87 S.Ct. 71, 17 L.Ed.2d 67 (1966). In analyzing the "totality of evidence" a number of factors should be examined to determine whether a sale had an experimental, not a commercial, purpose. These factors include: conditions placed on the sale, *Robbins v. Lawrence*,

482 F.2d 426, 432 (9th Cir. 1973); further testing required on the product, *Amerio Contact Plate Freezers, Inc. v. Belt-Ice Corp.*, 316 F.2d 459, 464 (9th Cir.), *cert. denied*, 375 U.S. 902, 84 S.Ct. 191, 11 L.Ed.2d 143 (1963), *Timely Products Corp. v. Arron*, 523 F.2d 288, 302 (2d Cir. 1975); explicit statements of an experimental purpose, *Austin Machinery Co. v. Buckeye Traction Ditcher Co.*, 13 F.2d 697, 700 (6th Cir. 1926), *cert. denied*, 273 U.S. 747, 47 S.Ct. 448, 71 L.Ed. 871 (1927), *Robbins*, 482 F.2d at 433; inventor's intent that transfer be for an experimental purpose, *In Re Yarn Processing Patent Validity Litigation*, 498 F.2d 271, 288 (5th Cir.), *cert. denied sub nom. Sauquoit Fibers Co. v. Leesona Corp.*, 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974); requirement that invention be kept confidential, *Ajem Laboratories, Inc. v. C. M. Ladd*, 424 F.2d 1124, 1125–26 (6th Cir.), *cert. denied*, 400 U.S. 830, 91 S.Ct. 59, 27 L.Ed.2d 60 (1970), *Robbins*, 482 F.2d at 432; further experimentation on the invention, *Del Mar Engineering v. Physio-Tronics*, 642 F.2d 1167, 1169 (9th Cir. 1981); commercial motive incidental to the experimental motive, *In Re Yarn Processing Patent Validity*, 498 F.2d at 277–78, *Pickering v. Holman*, 459 F.2d 403 (9th Cir. 1972); and reports to the inventor on transferee's use of the invention, *Robbins*, 482 F.2d at 433.

A number of these factors exist in this case. The April 28th agreement required Merry to notify Kock of all design changes and secure his approval of the patent application. Since reports to the inventor on the use of the invention by the transferee indicate a transfer for an experimental purpose, *Robbins*, 482 F.2d at 433, the notifica-

---

imagined where the transferee is limited by contract, for a time, to permissible experimentation so that he cannot make a commercial use or sale without prior notice to the inventor, or passage of the allotted time period. In the event of a sale with this "two-stage" nature, it is arguable the time when the inventor is informed of impending commercial use, or the expiration of the predetermined experimental period, would represent the point of sale within section 102(b). *Cf. Cali v. Eastern Airlines, Inc.*, 442 F.2d 65 (2d Cir. 1971), where it was held that an inventor's transfer to his employer for testing and later commercialization did not

trigger section 102(b) until the employer "first publicly used Cali's concept with a predominantly commercial intent." *Id.* at 71. We need not decide this issue here.

1. I agree with the majority's views that experimentation may occur even if no change in the invention proves necessary, Majority Opinion at 654, and that *Robbins v. Lawrence*, 482 F.2d 426 (9th Cir. 1973), allows evidence of experimental purpose beyond that contained in the written contract. Majority Opinion at 657.

tion requirement raises an inference that Kock and Merry intended the experimental process to continue.[2]

The transfer here required secrecy in the use of the device—another indicator of an experimental purpose. *Robbins*, 482 F.2d at 433. Kock swore in an affidavit that he and Merry agreed to keep the newly invented watch secret. There is no evidence that Kock revealed the workings of his invention to anyone other than his patent attorney and Merry, with whom he had an exclusive contract. Again, the evidence raises an inference that the transfer was for an experimental purpose.

A sale from an inventor to a manufacturer before the product has been "tested sufficiently to verify that it is operable and commercially marketable" raises an inference of an experimental purpose. *Timely Products Corp. v. Arron*, 523 F.2d at 302. For example, in *Amerio Contact Plate Freezers v. Belt-Ice Co.*, 316 F.2d at 465, this court held that selling activity does not activate section 102(b)'s one year period until an operative "prototype has been completed and tested," because such activity may be necessary to ascertain what product changes are required for successful commercial exploitation. The April 28th agreement contained a provision that Merry had ninety days to test the product and decide whether to produce it commercially. The agreement also required Kock to provide additional prototypes, if requested. This evidence raises the inference that, as of April 28, Kock's invention had not been sufficiently completed and tested to verify

that it was operable and commercially marketable. This inference places the sale within the experimental purpose exception to section 102(b).

The majority acknowledges that section 102(b) does not apply "to a sale to improve or perfect the invention.... where the profit motive is only incidental to the experimental ...." Majority Opinion at 654. The majority, however, fails to apply this rule to the facts of this case. Here, as discussed in the previous paragraph, the inference can be drawn that the purpose of the transfer was to improve or perfect the invention. Kock, after three months of work, transferred a prototype embodying his invention to Merry for an initial payment of $1,500. Under the contract, Kock was also to receive $1,000 for each additional prototype he was asked to produce. Moreover, he was to receive a three percent royalty based on the net selling price of all watches produced pursuant to the invention. The initial payment was minor compared to the eventual profits Kock hoped to reap. Thus, one might infer that Kock's profit motive, exhibited when he accepted $1,500 for three months work, was incidental to his experimental motive—that the invention be improved or perfected through the use of Merry's superior facilities. Again, one may draw the inference that the transfer was for an experimental purpose.

The majority opinion overlooks the inferences discussed in the preceding paragraphs.[3] Nonetheless, it concedes that

> [i]t may be the inventor here presented sufficient evidence to create a triable is-

---

**2.** The majority, however, suggests these reports were submitted only for Kock's information and have no bearing on whether the transfer was for an experimental purpose. Majority Opinion at 657. One could also interpret this requirement as implying that the parties intended to continue experimentation while giving Merry the final authority over all design changes. In a motion for summary judgment, conflicting inferences should not be resolved in favor of the moving party as the majority has done. *Pegasus Fund Inc. v. Laraneto*, 617 F.2d, 1335, 1339 (9th Cir. 1980).

**3.** Not only does the majority fail to draw inferences in favor of Kock, it draws them against

him. It writes that "[t]he contract contains provisions which encourage the inference that the invention was patentable and complete at the time of sale, and hence there is no experimental purpose explaining the transfer." Majority Opinion at 656. Inferences favoring the defendants which are "encouraged" by the evidence are irrelevant to this court's review of a summary judgment decision favoring the defendants since "all doubt must be resolved in favor of the party opposing the motion for summary judgment." *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1377 (9th Cir. 1978); *see also Pegasus*, 617 F.2d at 1339.

:sue of fact as to part of the required showing of experimental purpose based on the parties' subsequent conduct. There was evidence from which the trier of fact may have found the inventor continued to be involved in design after the date of sale. The invention, while concededly a working prototype at the time of sale, might have undergone further refinements before reduction to useful and manufacturable form. The pleadings at least admit the possibility the inventor was unable to determine whether the invention was worth patenting, or could be improved, without use of Merry's superior testing facilities.

Majority Opinion at 660–661.

This acknowledgment of a triable issue of fact as to the experimental purpose of the April 28th transaction should by itself require a remand.

There is also a question of fact whether the April 28th transfer was a transaction between an inventor and a third party within the product's production or distribution system. Such transfers, which reflect an experimental rather than a commercial purpose, do not constitute sales under section 102(b).[4]

The evidence suggests the April 28th transaction could have constituted a transfer within a production and distribution sys-tem. Kock began working on the invention after Merry sent Kock a letter, dated September 15, 1966, which detailed the watch movement Merry desired. Thus, the invention was built exclusively for Merry to meet its specific requirements. Since Kock maintained a royalty interest, most of his remuneration would derive from Merry's marketing of the ultimate product, not the initial $1,500 payment. As the majority notes, the worth of the product could have depended on the "use of Merry's superior testing facilities." Majority Opinion at 658. The contract called for Kock to continue to work as a consultant for Merry. Neither Kock nor Merry disclosed the invention to anyone other than Kock's patent attorney. The evidence recited above raises a strong inference that Kock and Merry constituted a production entity, a subject the majority fails to address.[5]

The majority opinion also ignores the policy behind section 102(b). As *Robbins* noted: "The underlying policy [of section 102(b)] appears to be that an *unconditional* placing 'on sale' creates an opportunity for public use." (Emphasis in the original.) 482 F.2d at 431. Here, the "sale" simply did not create an opportunity of public use. Thus, under *Robbins*, there should be no sale within the meaning of section 102(b).

Further, applying the on sale bar to this case does not advance the purpose of sec-

---

**4.** For example, in *Baker-Commack Hosiery Mills Inc. v. Davis Co.*, 181 F.2d 550 (4th Cir.), *cert. denied*, 340 U.S. 824, 71 S.Ct. 58, 95 L.Ed. 605 (1950), the Fourth Circuit upheld the patent after such a transfer because "there was no sale within the terms of the statute, but only certain preliminary steps looking toward sales which in fact never occurred." *Id.* at 558. In *Jack Winter, Inc. v. Koratran Company, Inc.*, 375 F.Supp. 1 (N.D.Cal.1974), *supp. op.*, 409 F.Supp. 1019 (1976), the court upheld a patent when the "sale" was within the "patentee's own distribution system." *Id.* at 37. *See also Marvin Glass & Associates v. Sears, Roebuck & Co.*, 318 F.Supp 1089 (S.D.Tex.1970), *aff'd in part, remanded in part on other grounds*, 448 F.2d 60 (5th Cir. 1974); Note, *New Guidelines for Applying the On Sale Bar to Patentability*, 24 Stan.L.Rev. 730, 745 (1972).

**5.** The majority opinion does, however, conclude that "[t]his is not a case where the inventor entered into a joint venture." Majority Opinion n.8, at 658. Thus, the majority ap-parently believes that transfers within a joint venture do not constitute a sale under section 102(b). The majority's observation is perplexing. First, it does not explain why transfers within a joint venture should be immune from the on sale bar, while transfers within a production system should be subject to the on sale bar. Second, the basis for the majority's belief that the agreement between Kock and Merry did not constitute a joint venture is that "the buyer here would eventually make commercial use of the invention." *Id.* It is not clear why future commercial exploitation is relevant to whether a sale for commercial purposes had already occurred. Furthermore, Kock, through the receipt of royalties, anticipated that he would "eventually make commercial use of the invention" concurrently with Merry—thus, Merry's anticipated commercial exploitation should not indicate the April 28th transaction was a transfer outside a production entity.

tion 102(b)—that is, "to prevent an inventor from having the advantage of a monopoly for more than the statutory period by engaging in the competitive exploitation of his invention." *Amerio Contact Plate Freezers, Inc. v. Belt-Ice Corporation,* 316 F.2d at 465; *see also Pickering v. Holman,* 459 F.2d at 406; Note, *New Guidelines for Applying the On Sale Bar to Patentability,* 24 Stan.L.Rev. 730, 734 (1972). Here the inventor was not attempting to prolong his monopoly but was trying to prepare the product for commercial exploitation. The purpose of section 102(b) is not served by applying the on sale bar to the sale of a single prototype produced under an exclusive contract with a production company. *Cf. Cali v. Eastern Airlines,* 442 F.2d 65, 69 (2d Cir. 1971). Here, the commercial exploitation contemplated by section 102(b) would have occurred when Merry marketed the completed watches. *Compare American Machine & Hydraulics, Inc. v. Mercer,* 585 F.2d 404 (9th Cir. 1978) (on sale bar applies to sale of 147 mufflers to ultimate customers); *Robbins,* 482 F.2d at 428 (on sale bar applies to sale of 50 cutters to the ultimate customer); *Super Mold Corp. v. Clapp's Equip. Div. Inc.,* 397 F.2d 932 (9th Cir. 1968) (on sale bar applies to sale of 248 tread aligners to the ultimate customer).

The majority opinion disregards the inferences of an experimental purpose raised by the evidence, disregards its own acknowledgment that a triable issue of fact exists, disregards the question whether the sale constituted a transfer within a production company, and disregards the policy and purpose of section 102(b). Instead, the majority concludes that defendants are entitled to summary judgment because "there is no basis for finding that Merry was required to perform further experimentation," the inventor "waived all control over the future course of the invention," and "Merry had the right of immediate exploitation." Majority Opinion at 658. The majority also seems to create an apparent per se rule for determining whether a sale has an experimental purpose. The majority states

> [i]t is not, however, enough that an inventor demonstrates by objective evidence that further experiment was necessary and was in fact performed by the transferee. To avoid the on sale bar, the inventor must further show that the transferee lacked authority to use the invention or exploit its commercial value.

Majority Opinion at 655. This rule has scant support in past decisions.[6]

In *Cali v. Eastern Airlines Inc.,* 442 F.2d 65 (2d Cir. 1971), Cali submitted to his employer, Pan Am, an idea that became the kernel of a patented invention. In an infringement action brought by Cali against Eastern Airlines, the district court found that Cali, by submitting his suggestion to Pan Am, put the idea in public use. Since such submission occurred more than a year before Cali filed his patent application, the district court applied section 102(b) and invalidated the patent. In so doing, the district court "observed that Cali placed no restrictions on Pan Am's use" of his idea. *Id.* at 69. The Second Circuit reversed because "absence of any control by Cali, or any attempt to impose control, should not be elevated to the status of a per se test under the circumstances disclosed here and in the posture in which we receive this case." *Id.* Thus, the Second Circuit held that the experimental process continued and that the public use bar was inapplicable, even though the invention was "out of the inventor's hands."

The majority also supports its holding by suggesting that the Supreme Court, in *City of Elizabeth v. American Nicholson Pavement*

---

6. The legal authority for these holdings is unclear. The majority supports its position by stating that "if the invention is out of the inventor's hands, it is irrelevant what experiments the buyer does or does not do with the invention." Majority Opinion at 9. The following cases relied on by the majority, however, do not support this position.

In *Tool Research and Engineering Corp. v. Honcor Corp.,* 367 F.2d 449, 453 (9th Cir. 1966), *cert. denied,* 387 U.S. 919, 87 S.Ct. 2032, 18 L.Ed.2d 972 (1967), our court merely noted that the inventor put no limitation on his product's use. We held the patent invalid because the sales put the invention into public use. *Id.* at 453. No such public use existed in the instant case.

In *Dart Industries, Inc. v. E. I. DuPont DeNemours & Co.,* 489 F.2d 1359, 1366–67 (7th Cir. 1973), *cert. denied,* 417 U.S. 933, 94 S.Ct. 2645, 41 L.Ed.2d 236 (1974), the court voided a patent because the inventor made several unqualified sales of the identical product. *Id.* at 1366–67. Kock sold only one prototype of the invention to a production company.

As I read the majority opinion, its holding is apparently based on the proposition that Kock's transfer of "all control" over the invention constitutes a sale under section 102(b). The degree of control relinquished by an inventor through a sale does bear on whether the sale had an experimental or commercial purpose. Relinquishment of control, however, should not, as the majority believes, be a conclusive indicator of a commercial purpose. The majority does envision situations where giving up all control might not compel application of the on sale bar. The majority states that a transfer to a buyer might not come within section 102(b)

> where the transferee is limited by contract, for a time, to permissible experimentation so that he cannot make a commercial use or sale without prior notice to the inventor, or passage of the alloted time period. In the event of a sale with this "two-stage nature," it is arguable the time when the inventor is informed of impending commercial use, or the expiration of the predetermined experimental period, would represent the point of sale within section 102(b).

Majority Opinion at 655–656, n.8. While the inventor in the majority's hypothetical would receive prior notification of a sale, which was more than Kock was entitled to, the hypothetical inventor would, in reality, have no greater control over the commercial exploitation of his invention than did Kock. Therefore, the majority's concession that its hypothetical inventor may avoid the on sale bar should apply equally to Kock.

One can also envision a situation in which an inventor with a partially completed prototype is forced by lack of funds to sell his invention to a production company. The company might not wish to devote its resources to complete the prototype or produce the product that embodies the invention, unless the company has the unqualified right to control marketing of the product. Granting such control should not terminate the experimental process. The production company should have the right to continue experimenting with the product, even if such experimentation takes longer than a year. Under the majority's view, however, to obtain a valid patent, an application must be filed within one year of the transfer of control.

The overriding consideration in applying section 102(b) to a sale is whether the sale had an experimental or commercial purpose. I suggest that the fact-finder treat transfer of control as a factor, not as a conclusive indicator of a sale within section 102(b). Courts should apply section 102(b) to invalidate a patent when the transfer of control over the invention, considered as part of the totality of the evidence, indicates the sale was for a commercial purpose. Treating transfer of control as a factor, rather than as a conclusive indicator of a sale, encourages continuation of the experimental process without fear of running afoul of section 102(b)'s one year period.

In short, the evidence in this case raises a material question of fact whether the April

Co., 97 U.S. 126 (1878), held that if there is to be an experimental purpose "tests made by one other than the inventor [must] be 'under his direction.'" (cite omitted). Majority Opinion at 660. This is an inaccurate reading of *City of Elizabeth*. The Court there simply noted that when experiments are under the inventor's direction, no public use occurs. Obviously, since courts have found experimental purpose even when the experiments were outside the inventor's direction, the rule the majority espouses is questionable. *See Cali*, 442 F.2d at 70, n.3 (It may be unrealistic and inconsistent with the patent laws to require that the inventor maintain control over experiments for the transfer to qualify as a sale with an experimental purpose.); *Cf. Dart*, 489 F.2d at 1366.

In fact, *City of Elizabeth* supports Kock's claim. The case equates a public use or sale with "abandonment" of the invention. *Id.*, 97 U.S. at 134. Here, the evidence does not show that Kock abandoned the invention.

The majority also relies on a quote from *Egbert v. Lippmann*, 104 U.S. 333, 336, 26 L.Ed. 755 (1881) that "if an inventor 'gives or sells [his invention] to another to be used by the donee without limitation or restriction, or injunction of secrecy,' there is public use (or public sale) within the statute." Majority Opinion at 660. This rule does not void the patent here because Merry and Kock agreed to maintain secrecy; therefore, an injunction of secrecy apparently existed.

28th transaction was primarily for experimental or commercial purposes. Our court has held that the question of experimental purpose in cases involving section 102(b) is a question of fact to be decided by the trier of fact after consideration of the totality of the evidence. *Cataphote Corporation v. De-Soto Chemical Coatings, Inc.,* 356 F.2d at 26; *Micro-Magnetic, Inc. v. Advanced Auto Sales Co., Inc.,* 488 F.2d 771, 773 (9th Cir. 1973). *See also,* 2 Deller's *Walker on Patents,* 714. I would therefore reverse the summary judgment and remand for trial.